OCCIDENTAL PETROLEUM CORPORATION AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21969–80.    Filed May 24, 1984.

*Robert J. Casey*, for the petitioners.
*Martin D. Cohen* and *David P. Fuller*, for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined deficiencies and additions to tax against petitioners as follows:

| Year | Deficiency | Additions to tax, I.R.C. 1954 | |
|------|------------|------------|------------|
| | | *Sec. 6653(a)* | *Sec. 6652(t)* [sic] |
| 1976 | $14,340,296 | $717,015 | |
| 1977 | 20,356,133 | 1,017,807 | $5,000 |

The deficiencies are based upon numerous adjustments, and the petitioners have raised some 91 separately enumerated allegations of error in the original petition. However, the parties have resolved all issues raised by those allegations of error, leaving for decision only the single issue raised in petitioners' "First Amendment to Petition": whether petitioners are liable for the minimum tax on items of "tax preference" under section 56, I.R.C. 1954, for their taxable year ended December 31, 1977. The parties have agreed that if petitioners are so liable, the correct amount of the liability is $7,010,015. The case is before us on the basis of a stipulation of facts and oral arguments made at the hearing when the case was submitted.

Occidental Petroleum Corp. (Occidental) is organized under the laws of California, with its principal office in Los Angeles, Calif. Pursuant to an extension of time, duly granted, petitioners (Occidental and its subsidiaries) filed on September 15, 1978, a consolidated Federal income tax return for the taxable year ended December 31, 1977, with the Fresno, Calif., Service Center, utilizing the accrual method of accounting.

Petitioners' 1977 consolidated taxable income as adjusted by the Commissioner and agreed to by the parties was

$730,297,281. This amount was computed by combining income from foreign sources and a loss from domestic sources, as follows:

| | |
|---|---|
| Income from foreign sources .................. | $777,205,730 |
| Loss from domestic sources .................... | (46,908,449) |
| Taxable income ................................. | 730,297,281 |

The loss from domestic sources was a composite of four separate items, a loss from domestic operations and three items of "tax preference," as defined in section 57(a), I.R.C. 1954:

| | |
|---|---|
| Loss from domestic operations .................. | $165,015 |
| Excess of accelerated depreciation on domestic real property over straight-line depreciation (sec. 57(a)(2)) ..................... | 250,408 |
| Excess of percentage depletion deductions, in respect of domestic mineral properties, over the adjusted basis of such properties as of the end of 1977 (sec. 57(a)(8)) ........... | 43,073,815 |
| Corporate capital gains tax preference (sec. 57(a)(9)(B)) ...................................... | [1]3,419,211 |
| Loss from domestic sources ..................... | 46,908,449 |

In respect of the 1977 income from foreign sources, various members of the consolidated group paid, or were deemed to have paid, foreign income taxes of $514,049,133. Petitioners elected, pursuant to section 901, to claim credit for these taxes for 1977. As a consequence of the availability of these "foreign tax credits," petitioners' Federal income tax liability for 1977, aside from any minimum tax on tax preference items, was zero. In addition, petitioners' foreign tax credits exceeded the amount of Federal income tax which would have been due even if petitioners' income were not reduced by the tax preference items.

---

[1] Strictly speaking, the corporate capital gains tax preference is not an amount which is deducted or excluded from gross income, but instead is based upon a preferential alternative tax rate to be applied to the portion of taxable income which is attributable to a "net capital gain." Sec. 1201(a), I.R.C. 1954. However, perhaps for purposes of simplicity, the parties have treated this preference item as though it were a deduction from gross income. Since nothing in the parties' arguments appears to turn on this distinction, their classification of this item will be accepted for purposes of this opinion.

Petitioners' excess foreign tax credits, i.e., those credits which exceeded petitioners' 1977 Federal income tax liability (as properly computed giving effect to the tax preference items), were available to be carried back to the 2 prior taxable years and carried over to the 5 subsequent taxable years, pursuant to section 904(c). However, it is stipulated that these credits expired unused.

The Commissioner determined, by way of statutory notice and amended answer, that petitioners were liable for minimum tax (on tax preference items) of $7,010,015 for 1977. As noted above, no issue is presented here as to the correctness of the amount determined. Instead, the parties disagree only as to whether, because petitioners had sufficient foreign tax credits available in 1977 to eliminate any Federal income tax liability even if the consolidated income were not reduced by the tax preference items, petitioners may properly be required to pay the minimum tax for 1977.

The matter at issue here may be set forth quite directly. In 1977, petitioners' income from foreign sources, less their loss from domestic *operations*, was $777,040,715. This amount was further reduced by the tax preference items, leaving taxable income of $730,297,281.[2] Petitioners' foreign tax credits, which in fact eliminated their Federal income tax liability on the $730,297,281 of taxable income, were sufficient to eliminate the Federal income tax liability even if the $777,040,715 of taxable income had not been reduced by the preference items. According to petitioners, they did not benefit from the preference items and therefore should not be liable for the minimum tax on those preference items. Petitioners recognize that the preference items freed a certain portion of the foreign tax credits to be carried back or carried over to other years, but point out that no benefit resulted in this respect either, since it is stipulated that these excess credits expired unused.

Except for two matters, Occidental and its subsidiaries litigated the same basic issue in a refund suit in the Court of Claims involving the years 1970 and 1971. *Occidental Petroleum Corp. v. United States*, 685 F.2d 1346 (Ct. Cl. 1982). There, as here, available foreign tax credits were more than sufficient to eliminate completely all Federal income tax for each of the

[2]As to the capital gains preference items, see note 1 *supra*.

years 1970 and 1971, regardless of whether the preference items were taken. into account in computing that tax. The Court of Claims in an exhaustive opinion concluded that the statutory provisions imposing the minimum tax for tax preferences[3] were literally applicable in that case and that there were no countervailing considerations, derived either from the legislative history or any other source, that called for reaching a different result. In its original presentation of the instant case to this Court, both at the oral argument and on brief, the Government took the position that the decision of the Court of Claims (sometimes hereinafter referred to as *Occidental I*) operated as collateral estoppel against petitioners in respect of what it described as the identical issue for 1977. Indeed, the Government characterized collateral estoppel as the "primary" issue now before us, and contended that petitioners are precluded from relitigating the point as to the later year.

However, there are two important differences between *Occidental I* and the present case. In the first place, section 301(d) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1553, added section 58(h) to the Internal Revenue Code of 1954, which provides:

SEC. 58. RULES FOR APPLICATION OF THIS PART

(h) REGULATIONS TO INCLUDE TAX BENEFIT RULE.—The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years.

And section 301(g) of the 1976 Act made these provisions effective for tax years beginning after December 31, 1975.[4] In the second place, the parties in the present case have stipulated that the excess foreign tax credits which were freed by the 1977 tax preferences for use in other years by the way of carrybacks and carryovers expired unused. This fact is in sharp contrast to the corresponding excess foreign tax credits which still retained their vitality for use by the way of carryovers to later years in *Occidental I*. 685 F.2d at 1347. Although this fact standing alone may not have been of

---

[3]Secs. 56 through 58, I.R.C. 1954. These provisions were added to the Code in 1969 by sec. 301 of the Tax Reform Act of 1969, 83 Stat. 580–586.

[4]The Court of Claims held in *Occidental I* not only that sec. 58(h) was not retroactive so as to affect liability for the minimum tax for the years 1970 and 1971, the years there in litigation, but also that section 58(h) was not declaratory of prior law. 685 F.2d at 1351–1352.

critical importance in *Occidental I*, since the Court of Claims appeared to reach the result in that case regardless of that consideration (685 F.2d at 1350), it is potentially of vital importance here when taken in conjunction with the new section 58(h), which is concerned with the tax benefit rule.

In the circumstances, it is clear to us that the doctrine of collateral estoppel has no application here. *Commissioner v. Sunnen*, 333 U.S. 591 (1948). After the filing of opening briefs, the Government, itself, has apparently come to realize the weakness of its position on this issue, and has informed the Court that it has abandoned the point. At the same time, it also informed the Court that it was not filing any reply brief in response to petitioners' strong opening brief. There remains then for consideration solely whether, on this record, section 58(h) calls for a result different from that reached in *Occidental I*. We hold that it does.

Section 58(h) relates to situations where items of tax preference are not productive of tax treatment resulting "in the reduction of the taxpayer's tax under * * * subtitle [A] for any taxable years." Plainly, in enacting section 58(h), Congress was concerned about not imposing the minimum tax on tax preferences where such tax preferences did not result in a tax benefit. The statutory language is sweeping in character, and is not restricted to tax benefits arising only from deductions. There is nothing in the terms of section 58(h) that would limit its operative scope so as to exclude the part that tax *credits* play in the determination of the ultimate amount of taxes that must be paid. Certainly, the language employed by Congress is literally couched in terms that are not limited to the amount of tax computed prior to the application of credits. Thus, section 58(h) refers specifically to items that "will not result in the reduction of the taxpayer's tax *under this subtitle* for any taxable years." (Emphasis supplied.) But "this subtitle" is subtitle A of the Internal Revenue Code, and it contains *all* the provisions—including those relating to credits—applicable to the taxpayer. The words of section 58(h) thus obviously refer to the "bottom line"—i.e., the amount of tax that the taxpayer is required to pay, not the "tentative tax"[5] computed prior to the application of credits like the foreign tax credit. We reject the

---

[5] Cf. *International Telephone & Telegraph v. Commissioner*, 77 T.C. 60, 63 (1981), affd. 704 F.2d 252 (2d Cir. 1983).

Government's contention that petitioners did receive a tax benefit from the preference items by using them in the computation of taxable net income. Such use is merely for the purpose of computing the tentative tax, not the final tax liability (determined after applying credits) with which, in our opinion, section 58(h) is concerned. Here, the items of tax preference did not result in any reduction whatever of petitioners' tax liability either for 1977 or for any other year.

To be sure, the Court in *Occidental I* recognized that, in the absence of section 58(h), the tax benefit concept had some applicability to the minimum tax for tax preferences in pre-1976 years, and it carefully analyzed the part that tax credits might or might not play in such years. In holding against petitioners, it considered not only the congressional awareness of the interplay between the foreign tax credit and the minimum tax provisions, but also the Code provisions that specifically govern and limit "the interface between the minimum tax and the foreign tax credit." 685 F.2d at 1348–1350. Moreover, to a certain extent, section 56(b) incorporates the tax benefit concept in the minimum tax provisions, and section 1.57–4, Income Tax Regs., spells out in detail limitations on amounts treated as tax preference where the taxpayer has tax deductions that are not productive of tax benefits. But neither section 56(b) of the Code nor section 1.57–4 of the regulations (finally adopted in 1978) deals with the situation where the preference items do not result in any tax benefit by reason of foreign tax credits. And section 1.57–4 is explicitly restricted to tax years beginning before 1976. Furthermore, T.D. 7564, 1978–2 C.B. 19, 21, in commenting upon section 1.57–4 of the regulations while still only in proposed form, made clear that those regulations were not the ones intended to implement the new section 58(h) of the Code for years beginning in 1976:

TAX BENEFIT RULE ADOPTED FOR TAXABLE YEARS
BEGINNING BEFORE JANUARY 1, 1976

Section 1.57–4 of the proposed regulations, relating to a limitation on amounts treated as items of tax preference, is being adopted, but will only be effective for taxable years beginning before January 1, 1976, the effective date of the Tax Reform Act of 1976. For taxable years beginning after this date, new regulations will be proposed in a separate document which will implement the tax benefit rule of section 58(h), added by section 301 of the

Tax Reform Act of 1976. These new regulations will not necessarily follow all the provisions in §1.57.4 [sic].

Although the Court of Claims in *Occidental I* declined to render any definitive determination as to the scope of the new section 58(h), it did make the following significant statement giving support for the view that the new 1976 provision did indeed modify prior law (originally enacted in 1969) so as to expand the theretofore limited application of the tax benefit rule under such prior law to provide in 1976 for the wholesale incorporation of full tax benefit rules into the minimum tax (685 F.2d at 1352):

The Congressional committees seemed to consider the pre-1976 law insufficient to support wholesale incorporation of full tax benefit rules into the minimum tax. We interpret the reference to the Secretary not to require him to do more with the 1969 law, but instead to empower him to prescribe the rules to implement the change wrought by the 1976 amendment.

In referring to the understanding of the congressional committees, the Court undoubtedly had in mind such statements as the following made by the Senate Finance Committee in explanation of the addition of section 58(h) to the Code (S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 151–152):

*Tax benefit rule.*—There are certain cases under present law in which a person derives no tax benefit from a tax preference. For example, if an individual has no adjusted gross income because of deductions for accelerated depreciation on real property (an item of tax preference under the minimum tax) and also has itemized deductions (which under these circumstances he is unable to use), the tax benefit from the accelerated depreciation deductions may be reduced or eliminated because of the unused itemized deductions. However, the individual may still be subject to the minimum tax on the accelerated depreciation. Similar problems can occur in the case of deductions for percentage depletion, the capital gains deduction, rapid amortization and intangible drilling expenses. To some extent, the Internal Revenue Service has been able to deal with this issue through regulations. To deal with this problem specifically, the amendment instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax benefit from the preference. For this purpose, a tax benefit includes tax deferral even if only for one year. The committee, by adding this provision, does not intend to make any judgment about the authority of the Treasury to issue these regulations under existing law.

See also H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, 823–824.

We are aware that the foregoing statement did not make any specific reference to the failure of tax preferences to produce tax benefits in the taxable year as a result of foreign tax credits or in any other year to which the excess foreign credits generated by the use of tax preferences might be carried. But the sweeping language of section 58(h) should leave no doubt that Congress was concerned with any and all uses of tax preferences that, in the language of section 58(h), failed to "result in the reduction of the taxpayer's tax under this subtitle for any taxable years." As shown in the above Senate Finance Committee report, Congress was concerned that the tax benefit rule had been applied too narrowly under existing law. The amendment was obviously intended to give the tax benefit rule unlimited scope. Indeed, the report discloses that Congress understood as a tax benefit covered by the new provision even such situation as the mere deferral of tax for only 1 year. Surely, a statute phrased in such comprehensive terms as section 58(h) was also intended to include reference to tax preferences that failed to produce a reduction in taxes for the taxable year through the use of foreign tax credits or for any other year by reason of carryover or carryback of excess foreign tax credits.

Although we recognize that analogies to other quite diverse sections of the Code may be treacherous, we nevertheless note that our conclusion in respect of section 58(h) is consistent with the understanding of the meaning of the same term "taxpayer's tax under this subtitle" as used in sections 111(b)(4) and 1016(a)(2)(B) of the Code. Section 111, entitled "Recovery of Bad Debts, Prior Taxes, and Delinquency Amounts," limits the amount which a taxpayer must include in gross income when in a later year there is a recovery of an amount which was deducted or credited in a prior year. The limitation is based on the "recovery exclusion," which is the portion of the item which did not result in a "reduction of the taxpayer's tax under this subtitle." While the regulations under section 111 are unclear in interpreting "taxpayer's tax" (compare sec. 1.111–1(a), Income Tax Regs., with sec. 1.111–1(b)(2), Income Tax Regs.), a contemporaneous analysis of the original version of section 111 (section 116 of the

Revenue Act of 1942) makes clear that the language employed in the statute represented a congressional choice to measure the "tax benefit" by the effect on tax liability rather than taxable income. See Plumb, Jr., "The Tax Benefit Rule Today", 57 Harv. L. Rev. 129, 154–155 (1943). See also *Corporation of America v. Commissioner*, 4 T.C. 566, 571 (1945); 1 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 5.7.3, n. 42 at 5–55 (1981).

Section 1016(a)(2) mandates an adjustment to the basis of property for "exhaustion, wear and tear, obsolescence, amortization, and depletion" *allowed* for any period. However, to the extent that the amount *allowed* exceeds the amount *allowable* for such period, the excess will only reduce the basis to the extent that it results "in a reduction for any taxable year of the taxpayer's taxes under this subtitle." Section 1.1016–3(b)(1), Income Tax Regs., which interprets this rule in respect of periods beginning on or after January 1, 1952, describes this excess portion as the "amount allowed as deductions in computing taxable income under subtitle A of the Code * * * and resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under subtitle A of the Code" over the amount allowable as deductions. Thus, the regulation clearly distinguishes between deductions which merely reduce taxable income and those which result in a reduction of the taxpayer's taxes.

We see no convincing reason to interpret section 58(h) any differently. While petitioners' preference items reduced taxable income, they did not result in a saving of tax dollars for any taxable year. This situation falls squarely within the statute.

Also, since section 58(h) is concerned with the reduction of the taxpayer's tax "for any taxable years," it plainly means that no minimum tax is to be imposed where the tax preference does not result in a decrease of tax not only for the year under consideration (here 1977) but also for any other year. As applied to the present case, petitioners' actual tax burden was not reduced for either 1977 or for any other year. It is of course true that the preferences did provide petitioners with a potential tax benefit for other years through the increase in the amount of foreign tax credits (freed by the tax preferences) that could be carried to other years. But it has

been stipulated that the carrybacks and carryovers expired unused. Accordingly, there was no "reduction of the taxpayer's tax under * * * subtitle [A]" either for 1977 or for any other year as a consequence of the preferences. In our view, a fair reading of section 58(h) would preclude the imposition of the minimum tax here. The preferences in this case did not result in a tax benefit directly or indirectly for petitioners in respect of *any* possible applicable year.

We note, of course, that section 58(h) is phrased in terms of directing the Secretary of the Treasury to prescribe regulations to carry out the stated legislative objective, and that the Secretary, to this day, some 8 years after the effective date of these new provisions, has not yet promulgated any such regulations. Moreover, we note further that he has not even published in the Federal Register any proposed regulations in this respect. However, the failure to promulgate the required regulations can hardly render the new provisions of section 58(h) inoperative. We must therefore do the best we can with these new provisions. Certainly we cannot ignore them.

Congress could hardly have intended to give the Treasury the power to defeat the legislatively contemplated operative effect of such provisions merely by failing to discharge the statutorily imposed duty to promulgate the required regulations.[6] As already indicated, we must give effect to these provisions in the absence of regulations, and, in our opinion, petitioners are not subject to the minimum tax for 1977 since the tax preferences did not produce any reduction in tax for any taxable year within the meaning of section 58(h).

In order to give effect to the stipulation of the parties in respect of other matters involved,

*Decision will be entered under Rule 155.*

---

[6]We do not necessarily mean to assess blame for the current sorry situation solely upon the Treasury. In a recent statement reported in the May 2, 1984, issue of the Wall Street Journal (p. 33), the Commissioner of Internal Revenue, Roscoe Egger, Jr., complained about the "complexities associated with the passage of frequent tax bills," and added that "We are tied up in knots drafting regulations to explain the frequent changes in law." It was further reported that at last count there was a backlog of 377 regulations yet to be completed, some of them pending since 1976. It would seem that at least some responsibility for the situation rests with the Congress itself by reason of its frequent massive revisions of the Internal Revenue Code, and we take judicial notice of the fact that the current pending bill to revise the Code contains over 1,000 pages of complex provisions. Nevertheless, once having been enacted, every new provision becomes the law of the land, and we must deal with it as such.