FIRST CHICAGO CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 38229-84.        Filed March 24, 1987.

*John L. Snyder, Bradford L. Ferguson, Michael R. Schlessinger, Paul S. Caselton, Peter F. Lovato III*, and *Francis O. McDermott*, for the petitioner.

*Seymour I. Sherman, James F. Kearney*, and *Gordon John Dickey*, for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined deficiencies against petitioner and "Affiliated Corporations" in the amounts of $1,261,807 for 1980 and $2,246,809 for 1981.[1] While the notice of deficiency makes numerous adjustments to the taxable income of petitioner and subsidiaries of petitioner, the deficiency is entirely in minimum tax and the sole issue raised in this case is whether petitioner is liable in the foregoing amounts for the minimum tax on tax preferences under section 56, I.R.C. 1954, for the years 1980 and 1981. Petitioner does not dispute the adjustments and computations in the notice of deficiency that result in minimum tax liability. Instead, it argues that it is not liable for any minimum tax for 1980 or 1981 since the tax preferences on which the minimum tax is based did not result in any reduction in petitioner's regular income tax liability for those years. The case was submitted on the basis of a stipulation of facts and attached exhibits.

First Chicago Corp., a Delaware corporation, was organized in 1969. Its principal office and principal place of business is in Chicago, Illinois. It filed consolidated 1980 and 1981 Federal income tax returns with the District Director at Chicago, Illinois.

Petitioner's[2] taxable income and regular income tax, for 1980 and 1981, as adjusted by the Commissioner, were as follows:

|  | 1980 | 1981 |
|---|---|---|
| Taxable income | $20,771,268 | $38,958,022 |
| Income tax | 6,347,111 | 11,885,042 |

The tax determined by the Commissioner to be due for both 1980 and 1981 was satisfied in full by applicable foreign tax

---

[1]In the notice of deficiency it was stated that "The deficiency shown above will be assessed severally against each corporation named above in accordance with Regulations prescribed under Section 1502". The regulations referred to are located in sec. 1.1502-6(a), Income Tax Regs., and they provide that a "parent corporation and each subsidiary * * * shall be severally liable for the tax" on a consolidated return. The corporations named were petitioner and 10 subsidiaries of petitioner. First Chicago Corp. filed the petition in this case as the common parent and agent for each subsidiary as allowed in sec. 1.1502-77(a), Income Tax Regs. Cf. *Dividend Industries, Inc. v. Commissioner*, 88 T.C. 145 (1987).

[2]Unless indicated otherwise by the context, reference to "petitioner" in such terms as "petitioner's income", "petitioner's tax", etc., is intended to refer to the combined income, tax, etc., of the entire group of corporations, including petitioner, for which consolidated returns were filed. See note 1 *supra*.

credits produced in those years. The foreign tax credits available in 1980 and 1981 and the credits remaining after application against tax are shown below:

|  | *1980* | *1981* |
|---|---|---|
| Foreign tax credit available | $17,558,812 | $21,800,538 |
| Income tax | 6,347,111 | 11,885,042 |
| Excess credits | 11,211,701 | 9,915,496 |

The following tax preferences were included in the computation of petitioner's taxable income for 1980 and 1981:

|  | *1980* | *1981* |
|---|---|---|
| Accelerated depreciation on real property | $1,385,618 | $1,712,011 |
| Percentage depletion in excess of basis | 108,918 | 197,591 |
| Capital gains | 6,931,352 | 13,079,126 |
| Total | 8,425,888 | 14,988,728 |

Had these items of tax preference not existed in 1980 and 1981, petitioner would nonetheless have had foreign and investment tax credits available in sufficient amounts to offset fully the tax liability calculated without tax preferences for each year. The regular income tax that would have been imposed on petitioner in 1980 and 1981 if the preferences had not existed, and the foreign tax credits that would have been left over after offset against that tax, are shown below:

|  | *1980* | *1981* |
|---|---|---|
| Foreign tax credits available | $17,558,812 | $21,800,538 |
| Tax if preferences had not existed | 10,223,019 | 18,779,857 |
| Excess credits | 7,335,793 | 3,020,681 |

Petitioner also had available investment tax credits in the amounts of $36,217,280 and $37,258,873 for 1980 and 1981, respectively.

As a result of the reduction in taxable income in 1980 and 1981 due to the tax preferences, petitioner had an increase in the amount of foreign tax credits which were not needed for use against taxable income but which were available to be carried back or forward.[3] The amounts of such increases

---

[3]For reasons not relevant here, the preferences appear to have no effect on the investment tax credit carryover in this case, and the parties seem to agree that such credits play no part in the present controversy.

in excess foreign tax credits attributable to the 1980 and 1981 items of tax preference are shown as follows:

|  | 1980 | 1981 |
|---|---|---|
| Excess credits with preferences | $11,211,701 | $9,915,496 |
| Excess credits without preferences | 7,335,793 | 3,020,681 |
| Excess credits due to preferences | 3,875,908 | 6,894,815 |

These excess foreign tax credits created by the preferences were not usable as carrybacks in 1978, 1979, or 1980. However, they remain available and usable for carryover to taxable years subsequent to 1981. The parties have stipulated that "It is not yet possible to determine the taxable years (if any) in which such carryforwards will be used, although it appears likely that such carryforwards will not expire unused".

The Commissioner determined that petitioner was liable for the minimum tax on tax preferences "in the amount of $1,261,807 for taxable year ending December 31, 1980" and in the amount "of $2,246,809.00 for taxable year ending December 31, 1981". Petitioner does not challenge the Commissioner's calculation of that minimum tax, but argues that it should not be required to pay any minimum tax for 1980 and 1981 because the preferences on which the tax is based were of no tax benefit to it in 1980 or 1981 (or any previous years) since they did not reduce petitioner's regular tax liability for any of those years. Both parties agree that petitioner received no tax benefit in 1980 and 1981 from the preferences because petitioner's foreign and investment tax credits would offset its tax liability even if the items of preference did not exist. They also agree that petitioner received no reduction in tax by means of the carryback of the excess foreign tax credits freed by the 1980 and 1981 tax preferences. Where the parties do not agree is the point at which the effect of potential tax reductions in carryover years is considered.

The essential matter in dispute is whether, as contended by the Government, a minimum tax on tax preferences must be imposed immediately in 1980 and 1981 when the preferences arose notwithstanding that they resulted in no tax benefit to petitioner for those or any carryback years. The contrary position, advocated by petitioner, is that the

minimum tax may be imposed only in a later year or years in which the extra foreign tax credits created by the theretofore useless preferences are used as carryovers and thereby produce actual reductions in petitioner's regular tax liability. To put the matter somewhat differently, it is the Government's position that the existence of the freed 1980 and 1981 foreign tax credit carryovers which create a *potential* for future reduction in tax should result in the imposition of the minimum tax in those early years, and that there is no basis for suspending the application of the statute to later years. On the other hand, petitioner argues that the minimum tax on its 1980 and 1981 tax preferences should be deferred to such later year or years when it might derive tax benefits as a consequence of those preferences. As a corollary to petitioner's position, of course, no minimum tax would ever be imposed to the extent that the foreign tax credit carryovers released by those preferences should expire without tax benefit to petitioner. At the heart of the controversy is the effect of the provisions of section 58(h), I.R.C. 1954, which was added to the Code in 1976.

Section 58(h) relates to the application of tax benefit principles to the minimum tax. It provides:

SEC. 58. RULES FOR APPLICATION OF THIS PART.

(h) REGULATIONS TO INCLUDE TAX BENEFIT RULE.—The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years.

Closely related to the problem are two cases involving Occidental Petroleum Corp. The first of those two cases was decided by the Court of Claims with respect to the years 1970 and 1971, prior to the 1976 enactment of section 58(h), *Occidental Petroleum Corp. v. United States*, 231 Ct. Cl. 334 (1982), 685 F.2d 1346 (*Occidental I*). The other, decided by this Court, involved the years 1976 and 1977, years governed by section 58(h), *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819 (1984) (*Occidental II*). Like the present case, *Occidental I* involved foreign tax credit carryovers freed by the originally useless preferences. Those foreign tax credit carryovers had not yet expired when the case was decided by the Court of Claims. In holding that

Occidental was liable for the minimum tax, the court made clear that the subsequently enacted section 58(h) was not applicable in respect of the tax years in which the preferences arose. *Occidental II*, on the other hand, involved later years governed by section 58(h). In *Occidental II*, preferences that were of no benefit in either the tax years at issue or prior years resulted in the release of extra foreign tax credits for use as carryovers. Those released credits had expired unused when the case was decided by this Court. In holding for the taxpayer, we relied upon section 58(h) and noted that the preferences were of no benefit whatever to Occidental. There was not then before us, nor did we consider, the central issue now being litigated, namely, whether the minimum tax should not be imposed in the years that the preferences arose and were of no tax benefit, but should be suspended and imposed only in such future year or years when they result in tax benefits. Upon careful reflection, it is our best judgment that a fair interpretation of section 58(h) in the light of its legislative purpose justifies the conclusion that no minimum tax is due here for the years in which the then useless preferences arose, but that the tax is best imposed only when, and only to the extent that, petitioner realizes tax benefits generated by the preferences. We so hold.

Section 58(h) must be considered in the context of the minimum tax itself. That tax first appeared in 1969 in a new Part VI, which was added to subchapter A of the Income Tax subtitle of the Code.[4] Part VI was captioned "Minimum Tax for Tax Preferences", and consisted of sections 56 through 58 of the Code.[5] Section 56(a) in substance imposed a tax with respect to a taxpayer's income equal to a fixed percentage "of the amount by which the sum of the items of tax preference exceeds the greater of" a stated base amount or the taxpayer's regular tax computed with certain specified adjustments. The "items of

[4]See sec. 301 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 580.

[5]The "minimum tax" is to be sharply distinguished from the "alternative minimum tax", which first appeared in the Code in 1978 and was then included in Part VI as sec. 55. See *Huntsberry v. Commissioner*, 83 T.C. 742, 748 et seq. (1984). Both taxes were concurrently applicable to the extent specified until Oct. 22, 1986, when the "minimum tax" was completely eliminated for taxable years beginning after Dec. 31, 1986. Pub. L. 99-514, 100 Stat. 2320. The "alternative minimum tax" alone survived, and is now embodied in Part VI as secs. 55 through 59.

tax preference" were listed and comprehensively described in section 57.[6]

Section 58, in a number of subsections, provided "Rules for Application of this Part".[7] Subsection (h) was added to section 58 in 1976, and, as will be more fully pointed out hereinafter, reflected a congressional concern to avoid imposition of the minimum tax on preferences in situations where the preferences did not produce tax benefits. To be sure, section 58(h) did not by its terms articulate its full scope with specificity. It was captioned "Regulations to Include Tax Benefit Rule", and it directed the Secretary broadly, without limitation, to "prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years".

In *Occidental II*, some 8 years after the effective date of section 58(h), we noted that the Secretary had not yet promulgated any such regulations nor even published any proposed regulations in this respect in the Federal Register, and we commented critically upon this "sorry situation". 82 T.C. at 829 n. 6. Now, some 3 more years have elapsed, and there is still not even a hint of any such regulations. Nevertheless, as we pointed out in *Occidental II*, "Congress could hardly have intended to give the Treasury the power to defeat the legislatively contemplated operative effect of" section 58(h) by failing to promulgate the relevant regulations. 82 T.C. at 829. And we stated further that we must do the best we can with section 58(h) in the absence of the pertinent regulations. The parties in the present case agree, and urge us to apply section 58(h) here as though it were a substantive provision rather than one merely delegating authority to or commanding the Secretary to promulgate regulations.

---

[6]The "items of tax preference" were characterized generally in sec. 1.56-1(a), Income Tax Regs., as representing "income of a person which either is not subject to current taxation by reason of temporary exclusion (such as stock options) or by reason of an acceleration of deductions (such as accelerated depreciation) or is sheltered from full taxation by reason of certain deductions (such as percentage depletion) or by reason of a special rate of tax (such as the rate of tax on corporate capital gains)".

[7]There have been amendments from time to time to Part VI, but, unless otherwise indicated, references to the various provisions thereof dealt with herein are directed to such provisions as they existed in or were applicable to the years involved.

Prior to the 1976 enactment of section 58(h) Congress had already provided a remedy in the case of one type of situation where the taxpayer might fail to get tax benefits from preferences. We refer to section 56(b) which was concerned with preferences that did not serve to reduce taxes in the current year by reason of a net operating loss any portion of which could be used as a carryover to a subsequent year. In those special circumstances, section 56(b) in effect made provision for a deferral of imposition of the minimum tax to such later year or years to which the net operating loss might be carried.[8] See *Zilber v. United States*, 585 F.2d 301, 303-304 (7th Cir. 1978). Also, in a regulation proposed in 1970 (35 Fed. Reg. 19769) that was finally promulgated in 1978 as section 1.57-4, Income Tax Regs., the Treasury gave effect to the tax benefit rule to a limited extent.

Notwithstanding the foregoing attempts to bring the tax benefit rule into play in a special situation by specific statutory provision or regulation, Congress was not satisfied with such piecemeal efforts to deal with the tax benefit problem in the context of the minimum tax on tax preferences. In *Occidental II*, we recognized that "Congress was concerned that the tax benefit rule had [prior to the enactment of section 58(h)] been applied too narrowly". 82 T.C. at 827. And we are convinced that in enacting section 58(h) Congress intended to provide for the application of the

---

[8]Sec. 56(b) provides in part as follows:

(b) DEFERRAL OF TAX LIABILITY IN CASE OF CERTAIN NET OPERATING LOSSES.—

  (1) IN GENERAL.—If for any taxable year a person—

    (A) has a net operating loss any portion of which (under section 172) remains as a net operating loss carryover to a succeeding taxable year, and

    (B) has items of tax preference in excess of $10,000, then an amount equal to the lesser of the tax imposed by subsection (a) or 15 percent of the amount of the net operating loss carryover described in subparagraph (A) shall be treated as tax liability not imposed for the taxable year, but as imposed for the succeeding taxable year or years pursuant to paragraph (2).

  (2) YEAR OF LIABILITY.—In any taxable year in which any portion of the net operating loss carryover attributable to the excess described in paragraph (1)(B) reduces taxable income, the amount of tax liability described in paragraph (1) shall be treated as tax liability imposed in such taxable year in an amount equal to 15 percent of such reduction.

  (3) PRIORITY OF APPLICATION.—For purposes of paragraph (2), if any portion of the net operating loss carryover described in paragraph (1)(A) is not attributable to the excess described in paragraph (1)(B), such portion shall be considered as being applied in reducing taxable income before such other portion.

The foregoing represents the text of sec. 56(b) as amended in 1976 by sec. 301(b)(1)(B) of Pub. L. 94-455. However, the basic provisions of sec. 56(b) appeared in the original version of Part VI which was introduced into the Code in 1969. See note 4 *supra*.

tax benefit rule in a broad and comprehensive manner.[9] Obviously, the absence of tax benefits could arise in a wide variety of situations, and Congress, rather than undertaking to conjure up every situation and deal specifically with the application of tax benefit principles in each, preferred to legislate on this matter in a broad sweep. The technique adopted was to provide for regulations to be promulgated by the Treasury, which, by reason of its broad practical experience and extensive exposure to a wide range of relevant situations, was presumably thought to be better situated to articulate the congressionally expressed objective in specific detail. As to the overriding congressional objective, we find illuminating the following statement by the Senate Finance Committee in its explanation of the addition of section 58(h) to the Code (S. Rept. 94-939, at 113-114 (1976), 1976-3 C.B. (Vol. 3) 49, 151-152):[10]

*Tax benefit rule.*—There are certain cases under present law in which a person derives no tax benefit from a tax preference. For example, if an individual has no adjusted gross income because of deductions for accelerated depreciation on real property (an item of tax preference under the minimum tax) and also has itemized deductions (which under these circumstances he is unable to use), the tax benefit from the accelerated depreciation deductions may be reduced or eliminated because of the unused itemized deductions. However, the individual may still be subject to the minimum tax on the accelerated depreciation. Similar problems can occur in the case of deductions for percentage depletion, the capital gains deduction, rapid amortization and intangible drilling expenses. To some extent, the Internal Revenue Service has been able to deal with this issue through regulations. To deal with this problem specifically, the amendment instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax benefit from the preference. For this purpose, a tax benefit includes tax deferral even if only for one year. The committee, by adding this provision, does not intend to make any judgment about the authority of the Treasury to issue these regulations under existing law.

Notwithstanding the clear legislative purpose behind section 58(h), the Government relies heavily upon the last four words of 58(h)—"for any taxable years"—as undercut-

---

[9]Cf. Comment of the Court of Claims in *Occidental I* to the effect that (685 F.2d at 1352): "The Congressional committees seemed to consider the pre-1976 law insufficient to support wholesale incorporation of the full tax benefit rules into the minimum tax".

[10]Virtually identical language appears in the Ways and Means Committee report at H. Rept. 94-658, 131-132 (1975), 1976-3 C.B. (Vol. 2), 695, 823-824.

ting petitioner's position. Plainly, that phrase used by the draftsmen of section 58(h) raises troubling problems of interpretation. Taken in its extreme literal sense it supports the Government's position here, for the parties have stipulated that "it appears likely that [the excess carryforwards produced by the 1980 and 1981 preferences] * * * will not expire unused". Thus, the record makes clear that in some future year or years the preferences will probably produce some tax benefits, and at least to that extent section 58(h) was not intended to relieve petitioner of the minimum tax. Petitioner does not disagree, but contends merely that the minimum tax should be imposed in such later year or years, not in the years that the preferences arose and were of no tax benefit to it.

Viewed in the light of the objective sought to be attained by section 58(h), we think that the "for any taxable years" phrase is susceptible of a construction that calls for the imposition of the minimum tax in the year or years that the preferences actually generate tax benefits through the operation of the freed-up foreign tax credit carryovers. And bearing in mind that 58(h) "was obviously intended to give the tax benefit rule unlimited scope" (*Occidental II*, 82 T.C. at 827), it would seem that the legislative purpose would be better served by treating the minimum tax as imposed here, not in 1980 and 1981 when the preferences generated no tax benefits, but in the later year or years when and to the extent that they might be responsible for tax benefits. This is the position urged upon us by the petitioner, and, when we take into account the loose character of the critical word "adjusted" in section 58(h), that result seems to be more in keeping with the congressional purpose than the extremely literal reading, relied upon by the Government, that focuses solely upon the last four words of section 58(h).

The reading of section 58(h) proposed by the respondent would create wholly impractical and even bizarre results that Congress could hardly have intended. Thus, when a taxpayer files its return for a year in which preferences occur, it cannot know with any degree of assurance, if at all, whether the excess foreign credit carryovers produced by its then useless preferences would ever yield any tax benefits to it in later years. Yet, the Government's position

would require it to pay the minimum tax at once in the early year, notwithstanding that the carryovers might expire thereafter unused without any tax benefit. True, at the time of the litigation in *Occidental II* (some 6 or 7 years after the tax years), it had become clear that there would be no tax benefits since the carryovers had by then expired unused. But that could not be known in advance.

The Government's views of section 58(h) would place a taxpayer in an awkward and perhaps impossible position. If the taxpayer pays the minimum tax for the early year and it turns out after the passage of years that the foreign tax credit carryover expires unused, no minimum tax would have been due for the early year. The taxpayer's only course in the later year would be a claim or suit for refund if the statute of limitations had not already run against it. The reading of section 58(h) proposed by petitioner calling for suspension of the imposition of the minimum tax until the preferences produce tax benefits would seem far more in keeping with a sound and workable interpretation of section 58(h). And that result can be attained by a fair interpretation of the loose phrase "shall be * * * adjusted" in those provisions.

We realize that in our opinion in *Occidental II* we referred to the "for any taxable years" language in section 58(h), and, in holding for the petitioner, we stressed the fact that the preferences there did not result in a tax benefit in any possible applicable year. However, we were concerned in that case only with liability for minimum tax in the initial years, and at the time we considered that issue, it was clear that no tax benefit had accrued justifying imposition of the minimum tax. Our attention was not focused in any way upon the possibility that the effect of the preferences that were useless in the initial years could be kept in suspense or deferred until such later year or years when they might produce tax benefits that would bring the minimum tax into play. In the circumstances, we recognize that although we thoroughly reaffirm the result that we reached in *Occidental II*, the language that we used was overly broad, and was not intended to be dispositive of the quite different issue that is now before us.

Apart from placing an impossible burden on many taxpayers at the time of filing their returns for the year when the preferences might arise, the Government's position could produce bizarre results in some circumstances. Suppose, for example, following the Government's position, that there would be a comparatively early adjudication against a taxpayer approving liability for minimum tax for a year in which no tax benefit was realized. Suppose further that the decision had become final prior to some later year when the surplus carryover credits generated by the preferences had expired without producing any tax benefit in any year. It would then be too late for the taxpayer to be relieved of the minimum tax already finally adjudicated against it. Yet, this is the result that would ensue if the Government's position were adopted here. We think that Congress could not have intended any such extraordinarily unfair consequences flowing from section 58(h), particularly when its objective was to do away with a restrictive application of the tax benefit rule. Section 58(h) was intended as a relief provision and should not be narrowly construed so as to defeat its purpose.

The Government has relied heavily upon section 56(b) as supporting its position here. It contends that section 56(b), relating to net operating loss carryovers, demonstrates that Congress knew how to provide for deferral of the minimum tax to later years when the theretofore useless preferences might produce tax benefits; that it could easily have accomplished a like result in connection with foreign tax credit carryovers; and that its failure to do so explicitly may be taken to reflect a deliberate legislative choice not to provide for any deferral here. Apart from the fact that we have not been referred to anything whatever indicating that Congress ever focused upon or considered the present problem when section 56(b) was enacted in 1969, the point is fatally defective. Even assuming that the contention could have some persuasive force for years prior to 1976, we are faced with an entirely different situation beginning with 1976 when section 58(h) was introduced into the Code. As we have previously noted, Congress was dissatisfied with piecemeal efforts to apply the tax benefit rule in respect of preferences and with the unduly narrow application of the

tax benefit rule up to that time. Its response was the enactment of section 58(h). We reject respondent's position to the extent that it rests upon section 56(b).

That section 58(h) was regarded as sufficiently sweeping to provide for suspension or deferral of the minimum tax until the preferences produce a tax benefit was clearly understood at the time of its introduction into the Code. In the General Explanation of the Tax Reform Act of 1976 (H.R. 10612, 94th Cong., Pub. L. 94-455), dated December 29, 1976, prepared by the Staff of the Joint Committee on Taxation, it is stated, referring at first to the general purpose of section 58(h), as follows (pp. 106-107):

There are certain cases in which a person derives no tax benefit from an item of tax preference because, for example, the item is disallowed as a deduction under other provisions of the Code or because the taxpayer has sufficient deductions relating to nonpreference items to eliminate his taxable income. To some extent, the Internal Revenue Service has been able to deal with this issue through regulations. To deal with this problem specifically, the Act instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax benefit from the preference. * * *

And in a footnote to the first sentence of the foregoing excerpt, the General Explanation made the following further explanation that is particularly relevant to the issue before us:

For example, preference items giving rise to losses which are suspended under at risk provisions (sec. 465 or sec. 704(d) of the Code) are not to be considered to give rise to a tax benefit until the year in which the suspended deduction is allowed. Similarly, investment interest which is disallowed (under sec. 163(d)) is to be treated as an itemized deduction for purposes of that preference only in the year in which it is allowed (under sec. 163(d)).

The Government seeks to distinguish that language on the ground that the particular deferrals referred to in the footnote are based on specific statutory provisions. However, the footnote begins with the significant words "For example", and we do not regard it as excluding from its scope any preference items which do not generate any tax benefit in the first year but which have the effect of producing a tax benefit in a succeeding year. The Govern-

ment's contention on brief (p. 9) that where section 58(h) "does apply, its sole effect is to reduce or eliminate the minimum tax liability for *the year of the tax preferences*, not to shift that liability to a different year" is plainly contradicted by the above explanation prepared for the Joint Committee. There is no meaningful difference in respect of the minimum tax on preferences between suspension of the effect of the preference items here from suspension of the items referred to as "example[s]" in the explanation. When petitioner filed its returns for 1980 and 1981, the tax preferences here, as those in the examples, had not produced, as required by section 58(h), any "reduction of the taxpayer's tax * * * for any taxable years". Certainly, a fair construction of section 58(h) calculated to give effect to the legislative objective would not call for treating these types of situations differently.

The Government also relies upon the provisions of section 901(a) of the Code, which, in conjunction with section 56, declare that the foreign tax credit shall not be allowed against the minimum tax on tax preferences. That reliance is misplaced. Petitioner seeks no foreign tax credit against the minimum tax. The foreign tax credit comes into play only as the conduit through which the tax preferences, themselves, produce a reduction in its *regular* tax for the later year or years, and in no sense does it operate as a "credit" against the minimum tax. The provisions of section 901(a) precluding the use of foreign tax credits against the minimum tax itself have no relevance or application here.

---

A final note. As indicated earlier, section 58(h) is framed in terms of commanding the Secretary to prescribe regulations. It states that "The Secretary *shall*[11] prescribe regulations * * *". (Emphasis added.) He has failed to carry out the mandate imposed upon him by the Congress. In effect, what we are now doing is to act in his place. Had he promulgated a regulation providing for the same result that we reach here, that regulation would not be "unreasonable" or "plainly inconsistent with the revenue statute". *Commis-*

---

[11]The Tax Reform Act of 1986 has changed this language to: "The Secretary *may* prescribe regulations". (Emphasis added.) The effect of that change in language can be of no concern to this Court in this case since the change does not apply to the tax years before us.

*sioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). It would therefore undoubtedly be sustained,[12] even though a different construction of the statute is possible. We do not relish doing the Secretary's work for him, but we have no other course to follow.

*Decision will be entered for the petitioner.*

---

[12]It is fundamental that "Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.' *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948)." *Fulman v. United States*, 434 U.S. 528, 533 (1978); *Bingler v. Johnson*, 394 U.S. 741, 750 (1969). See also *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Boske v. Comingore*, 177 U.S. 459, 470 (1900); *Brewster v. Gage*, 280 U.S. 327, 336 (1930); *Textile Mills Corp. v. Commissioner*, 314 U.S. 326, 336-339 (1941); *Colgate Co. v. United States*, 320 U.S. 422, 426 (1943). It is enough that the regulation "fall[s] within [the] authority to implement the congressional mandate in some reasonable manner", *United States v. Correll*, 389 U.S. 299, 307 (1967) or that "the interpretation or method is within the delegation of authority." *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981).