**FIRST CHICAGO CORPORATION,**
Petitioner–Appellee,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent–Appellant.**

No. 87–2028.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1988.
Decided March 16, 1988.

Teresa E. McLaughlin, Dept. of Justice, Washington, D.C., for respondent-appellant.

John L. Snyder, Hopkins & Sutter, Chicago, Ill., for petitioner-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and WILL, Senior District Judge.*

POSNER, Circuit Judge.

The government appeals from a decision by the Tax Court, 88 T.C. 663, holding that there is no minimum tax on tax-preference items until the items confer an actual benefit on the taxpayer. The facts are simple, their legal significance elusive.

In 1980 and 1981, First Chicago Corporation, the parent of the First National Bank of Chicago, had taxable income of $21 million and $39 million (we are rounding to the nearest million), on which income tax of $6 and $12 million would have been due had not First Chicago accumulated immense foreign tax credits. After applying these credits to the tax, First Chicago not only owed no tax in either year but had millions of dollars in credits left over to apply to income tax due in subsequent years. It also had large investment tax credits that it could have used in 1980 and 1981 but did not, instead carrying them forward along with the foreign tax credits for possible use in future years.

In figuring First Chicago's taxable income in 1980 and 1981, the Internal Revenue Service allowed certain deductions for what are called "tax preference items"— specifically, accelerated depreciation on real property, percentage depletion in excess of basis, and long-term capital gains. These deductions reduced First Chicago's taxable income by several million dollars in each year but did not save it any actual income tax in those years; its foreign and investment tax credits were so huge that even if it hadn't had the benefit of the

---

* Hon. Hubert L. Will, of the Northern District of     Illinois, sitting by designation.

tax-preference items it would have owed no tax. The only effect of the items was, by reducing the tax owed by First Chicago prior to use of the credits, to reduce the amount of those credits that it had to use up in 1980 and 1981 in order to eliminate all tax liability, and thus to increase—by a total of almost $11 million—the amount of those credits that it could use in future years. Whether or not First Chicago would ever use the extra credits to reduce its income tax was uncertain; that would depend on its taxable income in the years before the credits expired. Foreign tax credits, however, are usable for five years, see 26 U.S.C. § 904(c), and investment tax credits for fifteen, see 26 U.S.C. § 39(a)(1); and the parties stipulated that it was likely although not certain that First Chicago would eventually derive a tax benefit from the extra credits and thus indirectly from the 1980 and 1981 tax-preference items, though when and in what amount is uncertain; that would depend on its income in future years, on its deductions in those years, and on when the credits expire, and even on the last question the record is silent.

A section of the Internal Revenue Code passed in 1969, 26 U.S.C. § 56(a), imposes a 15 percent tax on the taxpayer's tax-preference items (after certain deductions). This is the minimum tax. For taxable years after 1986 the Tax Reform Act of 1986 has replaced the minimum tax with the alternative minimum tax (a creature that first appeared in the Code in 1978, that existed concurrently with the minimum tax until 1986, and that now survives alone). The 1986 Act is not directly in issue in this case, although it may, as we shall see, have an indirect bearing.

■ The purpose of minimum tax (original or alternative) is to make sure that the aggregating of tax-preference items does not result in the taxpayer's paying a shockingly low percentage of his income as tax. Although one might think that the minimum tax fails in this purpose because First Chicago paid no income tax in 1980 or 1981 even though it had substantial income in both years, it paid no income tax only by

virtue of having paid income tax to foreign countries, so it did not escape income taxation altogether. The Internal Revenue Service, however, decided that First Chicago should pay the minimum tax on the tax-preference items listed on its tax returns for 1980 and 1981 even though it had derived no tax benefit from those items in those years (thanks to its abundant tax credits) and may never do so, though probably it will do so some day. But the Tax Court, relying on a statute passed in 1976 which provides that the Treasury "shall prescribe regulations under which items of tax preference shall be properly adjusted where tax treatment giving rise to such items will not result in the reduction of the taxpayer's [federal income tax] for any taxable years," 26 U.S.C. § 58(h), disagreed.

■ Standing alone—that is, without section 58(h)—section 56(a) would impose minimum tax on tax-preference items even though the items never conferred a tax benefit on the taxpayer. This would be a harsh and arbitrary result. The reason for minimum tax is to prevent the taxpayer from using tax-preference items to escape income taxation; and if the taxpayer saves not a penny in income tax, the imposition of minimum tax would be punitive and bear no relation to the objective of the minimum-tax program. The sparse legislative history as well as the text of section 58(h) indicates that this section was added in order to prevent these anomalous consequences. The committee reports give the example of an individual who has no taxable income because of deductions for accelerated depreciation on real property (a tax-preference item) but, since he has other deductions as well, actually derives less (or it could be no) tax benefit from the accelerated depreciation, yet may still be subject to minimum tax on it. S.Rep. No. 938, 94th Cong., 2d Sess. 113 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2897, 3439. (The other committee reports are identical.) The example is puzzling; why doesn't the taxpayer take a smaller deduction for accelerated depreciation, to make sure he isn't claiming a tax preference (subject to the minimum tax) that is not generating any tax benefit for him? Who would claim a

deduction that would increase his tax liability?

These and other questions might have been answered if the Treasury Department had ever gotten around to promulgating regulations under section 58(h), as ordered to do by Congress, but it never did, blaming its default on a staggering workload caused by the number of tax bills that Congress has enacted in recent years. See *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819, 829 n. 6 (1984). The government might have been expected to, but does not, take the exceptionally hard line that since the Treasury never issued regulations under which items of tax preference "shall be properly adjusted" where the items yield no tax benefit to the taxpayer, section 58(h) is not in play at all, and First Chicago is exposed to the tender mercies of section 56(a), which imposes minimum tax on tax-preference items without regard to whether the taxpayer has ever benefited from the items or ever will. Instead the government concedes that section 58(h) is effective *ex proprio vigore*—that is, even without implementing regulations —but says that all it does is remove a tax-preference item from the minimum tax if the item *never* produces any reduction in the taxpayer's federal income tax, a condition negated here by the parties' stipulation.

The obvious objection to the government's position is that the determination whether the condition (no benefit, ever) has been satisfied cannot be made until the end of the period during which the tax-preference items might confer a tax benefit (here as long as fifteen years); and by that time the statute of limitations for seeking a tax refund, which is only two or three years, see 26 U.S.C. § 6511(a), will have expired. To this the government replies, first, that it will be happy to stipulate to an extension of the statute of limitations in such cases. See 26 U.S.C. §§ 6501(c)(4), 6511(c), (d)(3). And if it doesn't stipulate, there is some chance that the taxpayer might obtain relief under the mitigation provisions of the Code or the doctrine of equitable recoupment. See, e.g., *Kolom v. United States*, 791 F.2d 762 (9th Cir.1986). Alternatively,

the taxpayer could bring a suit for refund before the statute of limitations expired but ask the court to stay its proceedings until the period in which the taxpayer might benefit from the tax-preference items had expired, although a stay for fifteen years seems rather outlandish.

Second, the government argues that the Tax Court's approach, under which the minimum tax is imposed only if and when the tax-preference items actually generate a tax benefit, will, for years after 1986, interact confusingly with the new alternative minimum tax, and may enable the taxpayer to escape minimum tax altogether even if the items do generate an eventual tax benefit. The taxpayer cannot offset his liability for minimum tax, as distinct from his regular income tax liability, with foreign tax credits; otherwise First Chicago would have owed no tax for 1980 and 1981 even if its tax-preference items were subject to minimum tax. But the taxpayer can offset up to 90 percent of the post-1986 alternative minimum tax by foreign tax credits, see 26 U.S.C. § 59(a)(2), which First Chicago has in abundance. So maybe, under the Tax Court's interpretation of section 58(h), First Chicago will someday obtain a tax benefit from the tax-preference items listed on its 1980 and 1981 income tax returns yet escape all but 10 percent of the minimum tax due on the benefit.

The government's interpretation, however, makes very little sense, precisely in a case such as this where the taxpayer is likely to obtain an eventual tax benefit from tax-preference items. The taxpayer who obtains no benefit can at least obtain a refund, with interest, at the end of the carry-forward period—at least if he remembers the statute of limitations and stipulates with the government accordingly. But if he obtains a benefit eventually—say, ten years after listing the tax-preference item on his return—then, on the government's view, he will not be entitled to any refund, so he will have paid minimum tax on the item in year one even though he obtained no tax benefit from the item until year ten. Given the time value of money,

the tax in such a case may easily exceed the benefit. Suppose the minimum-tax rate is 15 percent, the taxpayer's marginal income tax rate is 38 percent, the tax-preference item, a deduction from taxable income, is $100 and will be used to reduce federal income tax ten years after being listed on the taxpayer's return, and the rate at which the taxpayer equates a future benefit to a present value (discount rate) is 10 percent a year. On the government's view, the taxpayer will owe $15 in minimum tax today. The taxed item will yield a $38 benefit ($100, the amount of the item, times 38 percent, the taxpayer's marginal income tax rate) in ten years; but as the present value of that benefit at a 10 percent annual discount rate is only $14.65, the tax-preference item will have yielded the taxpayer a negative tax benefit of 35 cents.

The numbers are arbitrary, but not unrealistic, and they show how the minimum tax, when applied in the manner suggested by the government, can turn a nominal 15 percent tax on tax-preference items into a more than 100 percent tax on those items. It seems altogether more reasonable that the tax be deferred until the benefit accrues; then in our example the tax is 15 percent regardless of when that happens —a result also consistent with the fundamental tax principle of matching income and expense temporally, on which see *Fishman v. Commissioner*, 837 F.2d 309, 312 (7th Cir.1988). It is true that, as a result of Congress's extreme restlessness in the area of tax law, by the time the benefit is obtained the structure of taxation may have changed and the taxpayer may escape part or even all of the tax. But this instability is built into tax law. If a taxpayer is able to defer income to a year when tax rates are lower, he obtains a tax saving analogous to what First Chicago may someday obtain if its tax-preference items yield a tax benefit which gives rise to a minimum-tax liability that it can offset with foreign or investment tax credits, thanks to the new alternative minimum tax. But the deferral may backfire, if the structure of taxation changes against the taxpayer.

The government's principal argument is that section 58(h) is clear on its face; but the only part of the face that the government will look at is the last four words— "for any taxable years." The government interprets this phrase to mean that, if the Treasury had promulgated regulations, they could not have permitted an adjustment if in any taxable year the tax-preference items would produce a benefit, however small. The words can be read that way, but do not have to be. They could just mean that the adjustment will be made for any taxable years in which the tax-preference item will not reduce the taxpayer's tax (i.e., 1980 and 1981 for First Chicago). The government does not insist that the first five words of the statute be read literally: "The Secretary shall prescribe regulations ..."; it concedes that, in the absence of regulations, the words mean: "The Secretary shall compute tax liability as if he had prescribed regulations...." So the government's commitment to the "plain meaning" rule is not consistent. Anyway the rule is not applicable, because the force of "for any taxable years" is unclear. Further, the rule cannot be applied to parts of sentences. Finally, it is a silly rule.

Words are not plain in themselves. They are plain only by virtue of a context that includes not only minimum cultural and linguistic competence but also, in the case of words that are intended to convey a command (the element of command is explicit here: "The Secretary shall prescribe...."), any other clues to the speaker's or writer's intentions. The government itself exploits the last point by saying that the Senate Report gives as the only example of a situation to which section 58(h) would apply the case where the taxpayer never does obtain a tax benefit from the tax-preference items. This may indeed have been the only situation that occurred to the draftsmen, although the report is less clear on the point than the government contends. See S.Rep. No. 938, *supra*, at 113–14. But not only is it the situation in which section 58(h) is least needful, since the taxpayer can protect himself by just not claiming the full deduction or exclusion

that the tax-preference items would entitle him to claim; it also is the situation taken care of by the government's offer to hold open the statute of limitations until the carry-forward period expires, and is therefore not problematic. The perversity of the government's position is fully revealed only by a case such as the present, where the taxpayer is likely to derive a tax benefit eventually. In such a case, imposing the minimum tax now may make the tax preference worth less than nothing—may in other words make the minimum tax a more than 100 percent tax on the tax benefits created by tax-preference items. Neither the language nor the legislative history of section 58(h) suggests that Congress wanted to bring about such a result.

Two important changes in the original context of section 58(h) should be noted. The first is the Treasury's failure to issue regulations, and the second is the passage of the Tax Reform Act of 1986. The two are related. It ill becomes the Treasury to complain that the Tax Court's method of adjustment—deferring the imposition of minimum tax until such time as the tax-preference items sought to be taxed generate a tax benefit—may interact with the 1986 Act to cancel out most of the taxpayer's minimum-tax liability, when the Treasury failed to prescribe its own method of adjustment though commanded by Congress to do so. And having conceded that section 58(h) operates of its own force even if no regulations have been enacted, the government cannot argue that the statute forbids the Tax Court to prescribe the required adjustment. It is, moreover, ironic that the Treasury should urge us at one and the same time to apply section 58(h) according to its plain meaning and to deem that meaning affected by a statute passed ten years later which does not mention section 58(h) (the Tax Reform Act of 1986, imposing the new alternative minimum tax).

■ If the Treasury had promulgated regulations under section 58(h), they might well have included a provision deferring minimum tax for taxpayers such as First Chicago that do not obtain a tax benefit in the year in which a tax-preference item first appears on its income tax return—although the position taken by the government in this case is contrary evidence. Without such a provision, any regulations promulgated under section 58(h) would be unresponsive to Congress's evident desire, however clumsily expressed, to avoid the anomaly of taxing people on benefits they don't actually receive. Whether they never receive them, or receive a negligible fraction of them many years later, is a detail—and the need for deferral of tax is actually greater in the second case than in the first, because in the second the taxpayer has on the government's view no remedy by way of a suit for a refund; section 58(h) does not (the government contends) apply in such a case. The government's interpretation would decapitate section 58(h). The Tax Court's interpretation is both consonant with the purposes of Congress in enacting the statute (so far as those purposes can be reconstructed) and unlikely to cost the Treasury substantial revenue.

AFFIRMED.