**OCCIDENTAL PETROLEUM CORPORATION**

v.

**The UNITED STATES.**

No. 253–79T.

United States Court of Claims.

Aug. 11, 1982.

Robert J. Casey, Washington, D. C., attorney of record, for plaintiffs. James R. Ron, John A. Craig, William F. O'Brien, Jr., William F. Conroy and Finley, Kumble, Wagner, Heine, Underberg & Casey, Washington, D. C., of counsel.

William B. Barker, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington D. C., for defendant. Theodore D. Peyser, Robert S. Watkins, Kenneth R. Boiarsky, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

OPINION

DAVIS, Judge:

This tax refund suit comes to us on fairly simple and straightforward stipulated facts. In calculating its income tax for the years 1970 and 1971, Occidental Petroleum Corporation claimed and was allowed deductions for percentage depletion under section 611 of the Internal Revenue Code in the aggregate amounts of about $190,000,000. This amount exceeded plaintiff's adjusted basis in the properties by approximately $19,000,-000. Occidental also properly received special treatment under section 1201 of the Code for about $18,000,000 in long term capital gains. Taking into account the advantages conferred by those two tax prefer-

ences,[1] plaintiff's regular tax imposed for the two years totalled nearly $188,000,000.[2] All of that amount was offset by available foreign tax credits allowed by sections 33 and 901.[3] For both 1970 and 1971, Occidental's available foreign tax credits also exceeded the tax for which Occidental would have been liable even if the special capital gains and depletion preferences had not existed.[4] Those foreign tax credits in excess of the regular tax imposed have been, and apparently still are, available to be carried over for use in years after 1971. Because of the two tax preferences, the Internal Revenue Service assessed, for the years 1970 and 1971, over $2,000,000 of minimum tax calculated under sections 56 through 58 of the Internal Revenue Code. Plaintiff does not contest the calculation of the amount of the tax; rather, it asserts that the minimum tax is not properly levied on tax preferences (defined in § 57) that need not have been used to avoid payment of tax. Occidental urges first that Congress did not intend to subject items of tax pref-

erence to the minimum tax if no tax would have been due had the tax preferences not existed. Occidental's second formulation is that items of tax preference that do not result in a tax benefit in the year in which they arise were not intended to be subject to the minimum tax in that year. Defendant takes the opposite positions. We hold for the Government.

### The Terms of the Minimum Tax Act

The normal canon requires that we start with the precise terms of the statute—a principle that is peculiarly appropriate to carefully formulated and complex tax legislation. Here the minimum tax provisions of sections 56 through 58 (I.R.C. §§ 56–58 (1970)), applied exactly as they are written, would levy a minimum tax on Occidental. That tax is defined to be 10% of the amount (if any) by which the sum of the items of tax preference exceeds a certain level.[5] The items of tax preference expressly include depletion below basis and part of the

---

1. In this opinion, the term "tax preferences" will refer only to those preferences specifically enumerated in section 57 of the Code.

2. The term "regular tax imposed" or "first imposed" means those amounts assessed under Chapter 1 (Normal Taxes and Surtaxes) of Subtitle A (Income Taxes (§§ 1–1552)) of Title 26 (The Internal Revenue Code) calculated without regard to (a) the taxes imposed by sections 56 through 58 (the minimum tax), (b) the other special taxes specifically mentioned within section 56 (none of which is applicable here), and (c) the credits enumerated in section 56 (of which only the foreign tax credit is applicable). In other words, the "regular tax imposed" is the amount of taxes Occidental would have been required to pay if the minimum tax and the foreign tax credit provisions had not been enacted.

3. We use "regular tax liability" to refer to the "regular tax imposed" less the allowable amount of credits listed in section 56. This is the amount Occidental was required to pay (other than the minimum tax) to the United States treasury—i.e., for these years, nothing.

4. We employ "preference-free regular tax imposed" to refer to the amount of regular tax that would be imposed if not for the tax preferences listed in section 57. In this case, the facts show that Occidental's available foreign tax credits exceeded its "preference-free regu-

lar tax imposed" as well as its "regular tax imposed".

5. The statute reads:
    "§ 56. Imposition of tax.
    (a) In General.
    In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—
    (1) the sum of the items of tax preference in excess of $30,000, is greater than
    (2) the sum of—
        (A) the taxes imposed by this chapter for the taxable year ... reduced by the sum of the credits allowable under—
            (i) section 33 (relating to foreign tax credit),
            (ii) section 37 ..., and
            (iii) section 38 ...; and
        (B) the tax carry overs to the taxable year." I.R.C. § 56(a)(1970).
    We call that level which preferences must exceed to incur the tax the "minimum tax triggering level." The minimum tax triggering level under the statute as of 1970 was equal to $30,000 plus the sum of the amounts specified in § 56(a)(2)(A) and (B). The term "regular tax deduction" used in the 1976 statute (see I.R.C. § 56(a) and (c) (1976)) embodies the same concept.

capital gains.[6] For the years 1970 and 1971, the sum of these two items of tax preference on plaintiff's return exceeded the minimum tax triggering level[7] by more than $25,000,000. Nowhere in section 56 or 57 is there an exception for plaintiff's situation, and plaintiff points to no statutory language that specifically excludes the preferences involved here. Nor does the statute, on its face, indicate a different result for cases in which the available foreign tax credits exceed the preference-free regular tax imposed.[8] The failure of Congress to include a specific exception for the present situation is significant. With as detailed a piece of tax legislation as this, a court might have to apply it as written even though it believed the omission of plaintiff's case was simply an oversight. But we think that, on the contrary, Congress directly adverted to the role of the foreign tax credit, and defined the exact roles that credit was to play.

A number of different passages within the minimum tax legislation indicate Congress' awareness of complexities arising from the application of the minimum tax to situations involving foreign income and taxes. First, in the very section imposing the minimum tax, Congress included as a component of the minimum tax triggering level the amount of any foreign tax credits allowed under section 33. *See* I.R.C. § 56(a)(2)(A)(i), note 5, *supra*. Thus, in the calculation of the tax, the Code provides

precisely that foreign tax credits are to be dealt with in a given way (which was in fact done here). Congress seems to have been quite aware that the foreign tax credit and the then new minimum tax provisions would interact with each other.

But that legislative reference to foreign tax credits carries a more direct message as well. Under subsection 56(a), *see* note 5, *supra*, a taxpayer compares the sum of tax preferences (less $30,000) to the minimum tax triggering level and, if the preferences are greater, pays a minimum tax of 10% of the difference. The specific inclusion of the foreign tax credit factor in § 56(a) ensures that the triggering level reflects the regular tax liability (note 3, *supra*), not the regular tax first imposed (note 2, *supra*). The provision thus focuses on the amount of money actually paid to the United States treasury after the foreign tax credit is taken into account, not the amount of tax calculated before reduction on account of foreign or other tax credits. That method of calculation strongly suggests that Congress intended to impose the minimum tax on those who, in spite of large incomes, had escaped contributing to the treasury because of the application of the foreign tax credit. Occidental is one such company.

Congress again acknowledged the interface between the minimum tax and the foreign tax credit when it amended (before the tax years involved here) section 901

---

**6.** "§ 57. Items of tax preference.

(a) In General.

For purposes of this part, the items of tax preference are—

\* \* \* \* \* \*

(8) Depletion.

With respect to each property (as defined in section 614), the excess of the deduction for depletion allowable under section 611 for the taxable year over the adjusted basis of the property at the end of the taxable year (determined without regard to the depletion deduction for the taxable year).

(9) Capital Gains.

(A) Individuals.

\* \* \* \* \* \*

(B) Corporations.

In the case of a corporation, if the net long-term capital gain exceeds the net short-term capital loss for the taxable year, an amount

equal to the product obtained by multiplying such excess by a fraction the numerator of which is the sum of the normal tax rate and the surtax rate under section 11, minus the alternative tax rate under section 1201(a), for the taxable year, and the denominator of which is the sum of the normal tax rate and the surtax rate under section 11 for the taxable year. In the case of a corporation to which section 1201(a) does not apply, the amount under this subparagraph shall be determined under regulations prescribed by the Secretary or his delegate in a manner consistent with the preceding sentence." I.R.C. § 57(a)(1970).

**7.** *See* note 5, *supra*.

**8.** The possibility that § 58(h), added in 1976, created an exception retroactive to 1970 and 1971 is discussed, and rejected, *infra*.

(dealing with the foreign tax credit) to preclude the use of foreign taxes as credits against the minimum tax. Pub.L.No. 91–172 § 301(b)(9), 83 Stat. 487, 585–86, *reprinted in* 1969 U.S.Code, Cong. & Ad.News 629, (codified as amended at I.R.C. § 901(a) (1970)). This very specific treatment of at least one signal aspect of the relationship of the foreign tax credit to the minimum tax also makes it unlikely that Congress simply overlooked plaintiff's situation. As above, the provision likewise carries a more specific message: the minimum tax is to be actually paid, not satisfied with available foreign tax credits.[9]

A third indication that Congress was well aware of foreign-tax-credit ramifications appears in subsection 58(g) of the minimum tax statute. That subsection spells out what is to be done when tax preferences apply to income attributable to foreign sources. For purposes of the minimum tax, those items are to be taken into account only to the extent they reduce the tax imposed by the United States on income derived from United States sources. The statute continues: "For purposes of the preceding sentence, items of tax preference shall be treated as reducing the tax imposed by this chapter before items which are not items of tax preference." I.R.C. § 58(g) (1970). Thus, Congress, a third time,

showed its recognition of the interplay between foreign income and the minimum tax. Also, for the third time, Congress seems to have indicated that the minimum tax was not to be circumvented or reduced by the foreign tax credit. Section 58(g) directs that, when it is unclear which deductions caused the reduction in taxes, it is to be assumed that, to the degree possible, the tax preference items were the cause. Where two types of deduction have both reduced the same taxes, the reduction (for purposes of the minimum tax) is to be attributed to the tax preference group. On this analogy, we should attribute the reduction in plaintiff's taxes not to the foreign tax credits (as Occidental contends), but to the items of tax preference.[10]

There is, still within the minimum tax legislation itself, another indication that plaintiff's proffered interpretation is not to be adopted. For tax years in which operating losses are to be carried forward, the Code defers imposition of the minimum tax. *See* § 56(b) (1970). There is no similar provision for foreign tax credits as related to the minimum tax.[11] Occidental says the imposition of its minimum tax should be similarly deferred until the extent of the benefit from the preferences becomes finally known.[12] But the explicit existence of subsection 56(b) shows that Congress delib-

---

**9.** Taxpayer seems to argue that, because Congress specifically excluded the use of the foreign tax credit to offset the minimum tax directly, Congress would not mind that the foreign tax credit be used indirectly (as here) to nullify the minimum tax. The responses to this argument are three in this case. First, plaintiff here did not take that position on its returns. It deducted the depletion below basis, and did not attempt to disclaim the preferential treatment of capital gains income. In fact, Occidental attempts to achieve the best of both worlds; it keeps the preferences, leaving more foreign tax credits for possible use in future years (plaintiff admits that the preferences here will confer a benefit if those foreign tax credits are eventually used), and also argues that it should be taxed (for these years) under the minimum tax as if it had not taken the preferential deductions. Second, Congress could well have felt no need to draft a separate provision dealing explicitly with the indirect reduction sought here because the statute as it is written automatically prevents such use of the foreign tax

credit (*see* our discussion, *supra*); aside from this conforming amendment, the minimum tax statute would not, however, itself preclude directly satisfying the minimum tax by use of the foreign tax credit. Third, the general objective of the provision seems to be that foreign tax credits are not to be used in any way to reduce the minimum tax (either directly or otherwise).

**10.** See also the discussion in note 9, *supra*.

**11.** The stipulated facts are that plaintiff had a foreign tax credit carryover even if its tax preferences did not exist.

**12.** When taxpayer took its tax preference deductions in 1970–71, the extent of its foreign tax credit carryover was materially enlarged. If that carryover credit was used in future years it would indisputably benefit Occidental. Plaintiff says, however, that if the carryover credit expired unused, Occidental would get no benefit at all from its 1970–71 tax preferences.

erately did not provide the same treatment for foreign tax credits. If we were to imply such a provision, we would be inserting something Congress did not—although as we have stressed, Congress seems to have been well aware of the possibilities of interconnection between the minimum tax and the foreign tax credit.

Plaintiff also contends that to impose the minimum tax in this situation is tantamount to including the foreign tax credit in the list of tax preferences, something Congress clearly did not do, see § 57. It may well be a matter of characterization or of language, but we do not think the result reached by the statute, as we read it, has the effect of making the foreign tax preference a statutory tax preference. We merely apply the minimum tax without regard (except as provided by the act) to the foreign tax credits. If Occidental's available foreign tax credits are divided into two groups, those used to offset regular taxes and those not used but carried over, the error we see in plaintiff's position is more apparent. For the foreign tax credits used to offset regular taxes imposed, the statute provides explicitly that they must be subtracted to reveal what taxes were actually paid. Because they increase the minimum tax, those credits are in a sense taxed, but only as provided by the statute. As to the unused (in 1970 and 1971) foreign tax credits, they neither incur a minimum tax, increase the minimum tax, nor are in any way diminished by the minimum tax—they remain available to offset regular taxes in subsequent years. Taking both groups together, we believe that the Code, as we interpret it, has the effect of taxing foreign tax credits only to the limited extent explicitly mandated by Congress.

### The Legislative History

Plaintiff relies primarily on the legislative history to support its position; it correctly notes that Congress was concerned that "many individuals and corporations . . . [did] . . . not pay a tax on a substantial part of their economic income as a result of the receipt of various kinds of tax-exempt

income or special deductions." S.Rep.No. 91–552, 91st Cong., 1st Sess. 111, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2142. Taxpayer maintains that it was free from tax not as a "result of the receipt of various kinds of [preferences]", but rather as a result of its foreign tax credits. We think this assertion overstates the facts. Two deductions on plaintiff's tax returns utilize special provisions (capital gains and depletion below basis) determined by Congress to be tax preferences. We cannot accept the view that plaintiff did not receive the preferences simply because it may not have needed them in order to be free of all tax in 1970–71. Occidental received the preferences and thereby obtained an enlarged carryover of its foreign tax credit. It is true that plaintiff did not pay tax on its income in 1970–71 partly for reasons outside the tax preferences, but the statute does not require the tax-free result obtained to be wholly and for those reasons alone. The statute, by its terms, requires only that the objectionable result be attributable to least partially to the tax preferences. Occidental has received preferential treatment of part of its income and for that it must pay this tax.

The legislative history, to us, reflects a Congressional concern for the way the tax code is perceived by the general public. It was feared that the appearance of unfairness would undermine our self-assessment system (which depends on taxpayer cooperation). *See* H.R.Rep. No. 91–413 (Part 1), 91st Cong. 1st Sess. 9, 77–78, *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1654, 1724–25; S.Rep.No. 91–552, 91st Cong. 1st Sess. 13, 111–12, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2040, 2142–43. In order to prevent the system from seeming inequitable, individuals and corporations with large incomes should not be able to avoid entirely the payment of domestic taxes. *See id.* But if we adopt plaintiff's construction of the act (even if it occurs that plaintiff is unable to use the enlarged carried over foreign tax credits), the end-result will be just that—a corporation with much income (of the preferential type) will appear, and not inaccurately so, to have

paid no United States taxes in 1970–71 and to have received because of the tax preferences a valuable foreign tax credit benefit for possible use in later years.

### The 1976 Amendment

Plaintiff insists, nevertheless, that it should not be considered to have received the preferences in 1970–71 because it did not benefit from them under traditional tax benefit rules which (according to one of taxpayer's arguments) were incorporated by subsection 58(h) into the minimum tax provisions for 1970–71. Subsection 58(h) was added in the 1976 amendments to the Code, Pub.L.No. 94–455 § 301(d)(3), 90 Stat. 1553, and must be declared to be retroactive in order to be of much (if any) benefit to Occidental. The subsection directs the Secretary to "prescribe regulations" for cases "where the tax treatment giving rise to such items [tax preferences] will not result in the reduction of the taxpayer's tax under this subtitle *for any taxable years*". (emphasis added) I.R.C. § 58(h) (1976). Occidental interprets the emphasized language to mean that the provision is retroactive to 1970–71 and takes account of the taxes for those years, considered individually. In plaintiff's view, the highlighted words relate back to the "prescribe regulations" requirement. We think the emphasized words modify the clause they follow rather than the "prescribe regulations" phrase at the beginning of the subsection. The regulations are to be aimed at situations in which the taxpayer will never benefit from the preferential treatment accorded by the Code—will never benefit "for any taxable years". This view is directly supported by the amendment itself; by its terms, it is effective only "after December 31, 1975", Pub.L.No. 94–455 § 301(g), 90 Stat. 1553. The legislative history gives further support. According to the Senate and House reports, the amendment is designed for

cases in which "the taxpayer does not derive any tax benefit from the preference. For this purpose, a tax benefit includes tax deferral even if only for one year." S.REP. No. 94–938 (Part I), 94th Cong.2d Sess. 113–14, *reprinted in* 1976 U.S.CODE CONG. & AD. NEWS 3439, 3549; H.R.REP. No. 94–658, 94th Cong.2d Sess. 132, *reprinted in* 1976 U.S. CODE CONG. & AD.NEWS 2897, 3027. Thus, a taxpayer must look to all years, not just the year of the preference, to determine whether the preference bears fruit or benefit. Furthermore, the report says "[t]he committee, by adding this provision, does not intend to make any judgment about the authority of the Treasury to issue these regulations under existing law." *Id.* If the committee had intended the amendment to apply retroactively in the way taxpayer wants, this statement would have been nearly pointless because the amendment itself would provide authorization for the regulations applicable to the same pre-1976 situations covered by the then current regulations. We conclude that the 1976 amendment does not apply to foreign tax credits in the years at issue here. *See Zilber v. United States*, 585 F.2d 301, 304 n.9, 306 (1978).[13]

Occidental argues, in the alternative, that subsection 58(h) did not change the law—the tax benefit rules were already applicable—but merely mandated that the Secretary promulgate appropriate conforming regulations. We cannot say, however, that the amendment has any such implication. It is possible that the amendment reflects a Congressional perception that the full tax benefit rules were always applicable. But, and at least equally plausible, the amendment can also be taken to mean that Congress thought the tax benefit rules or concepts did not already apply and should be added to the prior law. The Senate and House reports note that under the pre-1976 law, an "individual may still be subject to

---

**13.** Even if the provision were deemed retroactive, it is not clear it would apply. § 58(h), on its face, is applicable only if the treatment of the *items of tax preference* does not give rise to a tax benefit. Because the foreign tax credit here is arguably the item without a full and

definite tax benefit and it is not such an item of statutory preference, the subsection might not apply. Nor do we decide that § 58(h) necessarily incorporates the traditional tax benefit rules, or what those rules are. *See infra.*

the minimum tax" even though the preference item was of no tax benefit. S.Rep. No. 94–938 (Part I), 94th Cong.2d Sess. 113–14, *reprinted in* 1976 U.S.Code Cong. & Ad. News 3439, 3549: H.R.Rep. No. 94–658, 94th Cong. 2d Sess. 132, reprinted in 1976 U.S. Code Cong. & Ad.News 2897, 3027. And further, "[t]o some extent, the Internal Revenue Service has been able to deal with this issue through regulations." *Id.* The Congressional committees seemed to consider the pre-1976 law insufficient to support wholesale incorporation of full tax benefit rules into the minimum tax. We interpret the reference to the Secretary not to require him to do more with the 1969 law, but instead to empower him to prescribe the rules to implement the change wrought by the 1976 amendment.

Additionally, it is not clear from the amendment whether it is meant to cover cases, like this one, in which the asserted lack of benefit from the preferences stems from the availability of extra foreign tax credits rather than extra itemized (non-preferential) deductions. The parties have contested vigorously the scope of the traditional tax benefit rule and its applicability to tax credit situations. But without entering that fray, we can conclude from the unclear scope of the rule (whether it applies to credits or only to deductions) and the unclear nature of the amendment (whether it be a change or clarification), that the amendment has no clear import for the meaning of the earlier (1969) statute. The type of persuasive "evidence" needed to deviate from the operative words of that legislation, *see Hart v. United States*, 218 Ct.Cl. 212, 219, 585 F.2d 1025, 1028 (1978), is not present here either in the legislative history of the original minimum tax act or in the text and legislative history of the subsequent (1976) amendment.

### Administrative Interpretations

Plaintiff argues, too, that administrative decisions in analogous areas demonstrate that a full tax benefit concept applies in a general and all encompassing way to the minimum tax. Regulation 1.57–4 (Treas. Reg. § 1.57–4 (1978)) extends the tax benefit idea specifically incorporated in section 56(b) (for net operating loss situations) to other like cases in which deductions exceed income. Because the regulation covers only deductions, not credits, it does not apply directly to Occidental's case. The regulation may imply that the Treasury thought a tax benefit rule (as it conceived that rule to be) should apply more broadly than explicitly delineated in the 1969 act. But the regulation omitted to cover similar tax credit contingencies. Once again we are confronted with the difficulty of interpreting an omission; was it intentional or inadvertent? If intentional, the tax benefit rule should surely not apply to plaintiff's case. It may be (as defendant argues to us) that the Internal Revenue Service's formulation of the tax benefit rule does not include taxpayer's case. Without more information, no firmly grounded conclusion is possible. For cases not covered by its words, regulation 1.57–4, by itself, is simply not clear enough in implication to justify a judicial departure from the statute.

In two Revenue Rulings, the Service has demonstrated a willingness to apply certain tax benefit concepts in cases outside those specified in the act itself. Under those rulings (Rev.Rul. 73–43, 1973–1 Cum.Bull. 37, and Rev.Rul. 74–317, 1974–2 Cum.Bull. 13), a trust does not incur the minimum tax on tax preference (capital gains) income that is (according to the instrument governing the trust) permanently set aside for charitable purposes. Under subsection 642(c), the trust would be allowed a full deduction of the amount devoted to charity. But, in order to prevent a double deduction, regulation 1.642(c)–3(c) (following the Code) adjusts that deduction for any capital gains deduction taken under section 1202. By statute and regulation the trust is allowed the same deduction whether the income is long-term capital gains or not, but the characterization of the deduction varies. The two rulings, in turn, provide that the capital gains deduction, to the extent duplicated by the charitable deduction, need not be included as a tax preference. The first difference between the situations covered by

those rulings and the current case is that the capital gains treatment in the rulings is really *not* preferential. The Code, by requiring the amount of the charitable deduction to be reduced by the amount of capital gains deduction, gives a deduction on one hand and takes away an equivalent deduction on the other. Occidental's capital gains treatment is not similarly self-nullifying, nor is there any parallel Congressional treatment for taxpayer's case. Second, the rulings situation differs from Occidental's in that Congress showed no similar awareness of the charitable trust problem with respect to the minimum tax. As shown above, the general interplay of the foreign tax credit and the minimum tax was no doubt known to Congress when it acted. Nothing in the 1969 act demonstrates that Congress recognized the potential interaction of the section 642 provisions with those of the minimum tax. Congress may not have voiced a tax benefit rule or concept for those situations simply because the potential need was overlooked, or because it had already indicated its position with respect to charitable trusts in subsection 642(c), *supra*. Furthermore, the application of the tax benefit rule in the two rulings is, once again, extended only far enough to include situations involving redundant deductions, not credits. In sum, the two rulings cited by Occidental are insufficiently related to this case to be of any help. *See Zilber v. United States*, 585 F.2d 301, 305 (7th Cir. 1978); *Zilber v. United States*, 78–1 U.S.T.C. (CCH) 83060, 83062, 41 A.F.T. R.2d (P–H) 78–567, 569, (E.D.Wis. Nov. 22, 1977) *aff'd*, 585 F.2d 301, *supra*.

We agree with Occidental that the overall purpose of the minimum tax is "simply to require the payment of a realistic tax on income (in the broad constitutional sense) by certain taxpayers who enjoyed special deductions ... to such an extent as to reduce their liability to an unconscionably low level." Plaintiff's Response to Defendant's Supplemental Brief at 3, quoting the Chief Counsel of the IRS in the Government's opening brief in *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349 (1981). We neither contravene nor go be-

yond that purpose in this case. The inclusion of the allowable foreign tax credits in the minimum tax calculation means, in effect, that Congress has determined that an "unconscionably low level" is a level that may be totally offset by available foreign tax credits. Occidental enjoyed special deductions to that required extent and received tax benefits (in increased foreign tax credit carryovers) which, whether or not they fulfill the traditional tax benefit rules, are embodied in the general and popular concept of a valuable potential tax advantage.

### Conclusion of Law

Plaintiff is not entitled to recover under counts one and two of the petition and those counts are dismissed.