E.I. DU PONT DE NEMOURS & COMPANY, AND AFFILIATED CORPORATIONS, ET AL., [1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 19950–91, 19951–91, 19952–91, 19953–91.     Filed January 18, 1994.

---

[1] Cases of the following petitioners are consolidated herewith: Conoco, Inc., and Affiliated Corps., docket No. 19951–91; Remington Arms Co., Inc., docket No. 19952–91; and E.I. du Pont de Nemours & Co., Successor to New England Nuclear Corp., docket No. 19953–91.

*John L. Snyder, Bradford L. Ferguson, Michael R. Schlessinger*, and *Marilyn D. Franson*, for petitioners.
*John A. Guarnieri*, for respondent.

OPINION

HAMBLEN, *Chief Judge*: Respondent determined the following deficiencies in the Federal income taxes of E.I. du Pont de Nemours & Co. (Du Pont) and affiliated corporations; Conoco, Inc. (Conoco), and affiliated corporations; Remington Arms Co., Inc. (Remington); and New England Nuclear Corp. (NEN):

| Taxpayer(s) | TYE | Deficiency |
| --- | --- | --- |
| Du Pont, et al. | Dec. 31, 1979 | $13,010,040 |
| Conoco, et al. | Dec. 31, 1980 | 12,436,199 |
| Remington | Jan. 31, 1980 | 78,698 |
| NEN | Feb. 28, 1981 | 108,196 |
| Total | | 25,633,133 |

Unless otherwise indicated, section references are to the Internal Revenue Code in effect during the years in issue and 1982, and Rule references are to the Tax Court Rules of Practice and Procedure.

When these consolidated cases were submitted to the Court, an issue involving depletion as a tax preference item under section 57(a)(8) was unresolved. The parties agreed, however, to abide by the decision in a case then pending before the Supreme Court. In its eventual resolution of that case, the Court held in favor of the Government. *United States v. Hill*, 506 U.S. ____, 113 S. Ct. 941 (1993). Accordingly, the sole issue for our decision is the validity of section 1.58–9, Income Tax Regs., as invoked by respondent in determining the above deficiencies. This regulation, corresponding to section 58(h), involves the application of the tax benefit rule to the minimum tax imposed by section 56.

*Background*

These cases were submitted fully stipulated under Rule 122. The stipulation and attached exhibits are incorporated by this reference. When the petitions were filed, the principal place of business of Du Pont and Remington was in Wilming-

ton, Delaware, and the principal place of business of Conoco was in Houston, Texas.[2]

For calendar year 1982, Du Pont filed a consolidated Federal income tax return as the common parent of an affiliated group (the Du Pont group), which by then included NEN and all of petitioners. The "tentative" income tax liability of the Du Pont group, before tax credits and recapture of credits, was $256,844,566. Various types of credits available to the Du Pont group, including foreign, investment, jobs, and research credits, totaled $469,997,179. After a full offset of the tentative tax liability, excess credits of $213,152,613, mostly investment tax credits, remained.[3] Allocated portions of the excess credits were carried back to the taxable years in issue, a period during which the four taxpayers—Du Pont and affiliated corporations, Conoco and affiliated corporations, Remington, and NEN—did not join in consolidated returns with one another.

Until 1987, section 56 imposed on corporations a so-called minimum tax, based on tax preference items, as an add-on to the regular income tax imposed by section 11. See sec. 12(8). Tax preference items, listed in section 57, represented—

income of a person which either is not subject to current taxation by reason of temporary exclusion (such as stock options) or by reason of an acceleration of deductions (such as accelerated depreciation) or is sheltered from full taxation by reason of certain deductions (such as percentage depletion) or by reason of a special rate of tax (such as the rate of tax on corporate capital gains). * * * [Sec. 1.56–1(a), Income Tax Regs., T.D. 7564, 1978–2 C.B. 19, 23.]

The minimum tax during the period in issue was equal to 15 percent of the excess of tax preference items over the greater of $10,000 or the "regular tax deduction". Sec. 56(a). The regular tax deduction was equal to income tax liability, including investment tax credit recapture, as reduced by certain credits. Sec. 56(c).

Tax preference items totaled $177,082,305 for the Du Pont group in 1982. Without regard to the minimum tax, had

---

[2] The petition in docket No. 19953–91 was filed by Du Pont as successor to NEN. NEN was merged into Du Pont sometime after the year for which respondent determined the NEN deficiency.

[3] Recapture of investment tax credits, which recapture was not subject to offset by credits, caused the actual post-credit, post-recapture tax liability of the Du Pont group for 1982 to equal $5,626,409.

these items not been taken into account in the computation of taxable income, the regular tax liability before credits and recapture would have been $81,457,860 higher; i.e., the marginal tax rate of 46 percent from section 11(b)(5) multiplied by $177,082,305. Although the Du Pont group had sufficient credits to offset in full even this higher tentative tax liability, a consequence would have been $81,457,860 less in credits available for carryback or carryover. Hence, use of the preference items for regular tax purposes in 1982, which use did not reduce 1982 tax liability, nonetheless reduced taxable income and thereby "freed up" $81,457,860 of credits for carryback to the years in issue. Over $65 million of this freed-up amount represented regular investment tax credits, with the remainder about equally divided between energy credits and so-called TRASOP (Tax Reduction Act Stock Ownership Plan) credits.

The statutory provision most directly in issue is section 58(h), which originated in the Tax Reform Act of 1976, Pub. L. 94–455, sec. 301(d)(3), 90 Stat. 1553:

SEC. 58(h). REGULATIONS TO INCLUDE TAX BENEFIT RULE.—The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle [A—Income Taxes] for any taxable years.

This Court had occasion to consider section 58(h) prior to the issuance of temporary regulations in 1989, T.D. 8249, 1989–1 C.B. 15, and substantially identical final regulations in 1992. T.D. 8416, 1992–1 C.B. 7.

In *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819 (1984), the taxpayer had no regular tax liability for 1977 because of available foreign tax credits, which were not preference items. These credits were sufficient to offset in full the tentative tax liability that would have resulted if income had not been reduced by preference items, meaning that there was no tax benefit attributable to the preferences in 1977. In addition, although the credits not needed to offset actual tentative tax liability for 1977 were available for carryback or carryover to other years, they expired unused. The 1977 preferences thus did not result in a tax benefit for any applicable year, and we held that section 58(h) precluded the imposition of the minimum tax for 1977. *Id.* at 829.

In *First Chicago Corp. v. Commissioner*, 88 T.C. 663 (1987), affd. 842 F.2d 180 (7th Cir. 1988), the taxpayer had no regular tax liability for 1980 or 1981, again because of foreign tax credits. As in *Occidental Petroleum*, the credits were sufficient in amount to offset in full the tentative tax liability that would have resulted if income had not been reduced by preference items, meaning that there was no current tax benefit from the preferences. Unlike the circumstances in *Occidental Petroleum*, however, the excess credits freed up by the preferences had not yet expired unused. The Commissioner argued that the minimum tax should be imposed for 1980 and 1981 because of the potential for tax reduction in subsequent years. We disagreed, concluding that, under section 58(h), the minimum tax consequences should await the years when the taxpayer derived tax benefits resulting from the preferences. *Id.* at 667–668.

The situation confronting us in the instant cases differs from *Occidental Petroleum* and *First Chicago* in two major respects. First, the excess credits freed up by the 1982 preferences of the Du Pont group have been applied, and thus have actually generated tax benefits, in other years. Second, we now have a regulation, section 1.58–9, Income Tax Regs., promulgated under section 58(h), which by its terms applies to the years under consideration. See sec. 1.58–9(b), Income Tax Regs. (regulation effective for taxable years beginning after 1976 and before 1987). The parties agree on how the regulation applies to the facts before us, and, assuming that the regulation is valid, petitioners do not dispute respondent's deficiency determinations. Petitioners claim, however, that the regulation is not valid, and they offer an alternative means of implementing section 58(h) that results in a greatly reduced total deficiency.

The regulation begins with a proposition uncontested by petitioners: a taxpayer is not subject to minimum tax in the current year for preferences that, because of available credits, do not have the effect of reducing current regular tax liability. Sec. 1.58–9(a), Income Tax Regs.; accord *First Chicago Corp. v. Commissioner, supra.* Consistent with this principle, and as agreed by the parties, the Du Pont group has no minimum tax liability for 1982 because its preferences of $177,082,305 did not provide a tax benefit in that year. See sec. 1.58–9(c)(3)(ii), Income Tax Regs. The parties also agree

that the credits freed up by these nonbeneficial preferences equaled $81,457,860.[4] See sec. 1.58–9(c)(2), Income Tax Regs.

The regulation further provides, and petitioners here disagree, that any credits freed up by nonbeneficial preferences must be reduced before carryback or carryover to other taxable years. Sec. 1.58–9(a), Income Tax Regs. The amount of the credit reduction is the minimum tax that would have applied if the taxpayer had derived a current tax benefit from the preferences. Sec. 1.58–9(c)(1), (5), Income Tax Regs. This credit-reduction amount is allocated among the freed-up credits by either an "exact" method or, if elected, a "simplified" method. Sec. 1.58–9(c)(5), Income Tax Regs. For the Du Pont group, the credit-reduction amount is $25,633,133, resulting from the 1982 preference amount of $177,082,305, less $6,194,754 (reflecting the regular tax deduction), with the difference multiplied by 15 percent.[5] See sec. 56(a).

In effect, the regulation computes and suspends the minimum tax amount that, absent section 58(h), would be imposed currently on nonbeneficial preferences. The taxpayer becomes liable for this suspended amount, in the form of regular tax, when the credits freed up by the preferences result in a regular tax benefit. In the instant cases, petitioners did not reduce the credits carried back to the years in issue, contrary to the regulation. Accordingly, respondent determined deficiencies in regular tax liabilities that summed to the amount of the minimum tax suspended in 1982, $25,633,133.

Although petitioners recognize that actual tax benefits derived from the 1982 preferences may properly entail an accompanying tax cost in the benefit years, their approach to implementing section 58(h) is much different than that of the allegedly invalid regulation. In contrast to respondent's suspended-tax method, which affects regular tax liability in the benefit year, petitioners advocate what is more appropriately characterized as a suspended-preference approach, which affects, if anything, only minimum tax liability in the benefit year. Generally, for minimum tax purposes, petitioners treat

---

[4] As we use the term, preferences are "nonbeneficial" if they do not result in a reduced liability for regular tax in the year they arise.

[5] The amount reflecting the regular tax deduction exceeds by $568,345 the investment tax credit recapture amount of $5,626,409. See *supra* note 3. This is because sec. 56(c), defining the regular tax deduction, excludes from offsetting credits the TRASOP "employee plan percentage" under sec. 46(a)(2)(E), which here is $568,345.

originally nonbeneficial preferences as arising in the years when the taxpayer realizes the benefits of those preferences by using freed-up carryback or carryover credits.

More specifically, for each of the four corporations or affiliated groups with a determined deficiency, petitioners would apply section 56 as follows: (1) Carry back the taxpayer's apportioned share of the consolidated 1982 preferences, for aggregation with its actual preferences arising in the benefit year; (2) subtract the regular tax deduction for the benefit year (as diminished under section 56(c) by the unreduced carryback credits); and (3) multiply the result by the 15-percent rate for minimum tax. Under this approach, only Conoco and affiliated corporations would have a minimum tax liability, which would be $10,551,956 for taxable year 1980. Du Pont and affiliated corporations, Remington, and NEN would not be subject to minimum tax for their years in issue because their respective aggregated preferences would not exceed their respective regular tax deductions.

The following table sets forth the computational details of petitioners' methodology: [6]

| | Du Pont, et al. | Conoco, et al. | Remington | NEN |
|---|---|---|---|---|
| Allocation of 1982 preferences | $89,688,646 | $86,102,728 | $541,872 | $749,059 |
| Plus: Preferences arising in benefit year | 9,047,472 | 86,204,455 | 18,847 | 80,750 |
| Total preferences applicable to benefit year | 98,736,118 | 172,307,183 | 560,719 | 829,809 |
| Regular tax in benefit year (before credit carryback) | 274,420,715 | 181,077,896 | 2,367,401 | 4,684,213 |
| Plus: TRASOP Credit | 15,192,745 | 18,034,391 | - - - | - - - |
| Less: Credit carryback from 1982 | 113,146,438 | 97,151,475 | 837,139 | 2,017,561 |
| Regular tax deduction in benefit year | 176,467,022 | 101,960,812 | 1,530,262 | 2,666,652 |

---

[6] Because of minor inconsistencies in the stipulation and rounding, some of these amounts do not exactly match certain paragraphs in the stipulation.

| | Du Pont, et al. | Conoco, et al. | Remington | NEN |
|---|---|---|---|---|
| Minimum tax base (excess of preferences over regular tax deduction) | - - - | 70,346,371 | - - - | - - - |
| Minimum tax at 15% | - - - | 10,551,956 | - - - | - - - |

The parties are thus approximately $15 million apart on the question of petitioners' tax liability for the years in issue. Respondent's approach, in section 1.58–9, Income Tax Regs., accounts for the 1982 suspended liability of $25,633,133 on a dollar-for-dollar basis in the carryback years. In other words, because freed-up credits provide a tax benefit of at least $25,633,133 in the carryback years, the suspended liability from 1982 is fully reinstated in those years. Petitioners' method, in contrast, permits regular tax liability in the carryback years (in the form of the regular tax deduction under section 56(c)) to provide a substantial sheltering effect that greatly reduces the overall liability in those years.

## Discussion

The Supreme Court has described the judicial deference to Treasury regulations as follows:

Congress has delegated to the Secretary of the Treasury, not to this Court, the task "of administering the tax laws of the Nation." *United States v. Cartwright*, 411 U.S. 546, 550 (1973); accord, *United States v. Correll*, 389 U.S. 299, 307 (1967); see 26 U.S.C. § 7805(a). We therefore must defer to Treasury Regulations that "implement the congressional mandate in some reasonable manner." *United States v. Correll, supra*, at 307; accord, *National Muffler Dealers Assn. v. United States*, 440 U.S. 472, 476–477 (1979). To put the same principle conversely, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); accord, *Fulman v. United States*, 434 U.S. 528, 533 (1978); *Bingler v. Johnson*, 394 U.S. 741, 749–751 (1969). * * * [*Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981).]

A regulation generally is valid if reasonable and if consistent with the plain language, origin, and purpose of the statute. *Estate of Bullard v. Commissioner*, 87 T.C. 261, 269 (1986). In this analysis, a legislative regulation, which flows from a specific congressional grant of authority, is entitled to

greater deference than a regulation promulgated under the general rulemaking power in section 7805(a). *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982). The primary inquiry in the case of a legislative regulation is "whether the interpretation or method is within the delegation of authority." *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981). Section 58(h), the delegating statute here, provides that "The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax * * * for any taxable years."

While we acknowledge the normal importance of the statutory language, section 58(h) standing alone does not provide specific guidance as to whether the credit-reduction mechanism of section 1.58–9, Income Tax Regs., is valid. In *First Chicago Corp. v. Commissioner*, 88 T.C. at 669, we stated: "To be sure, section 58(h) did not by its terms articulate its full scope with specificity." We further noted some inartful drafting: "Plainly, that phrase ["for any taxable years"] used by the draftsmen of section 58(h) raises troubling problems of interpretation." *Id.* at 672; see *First Chicago Corp. v. Commissioner*, 842 F.2d 180, 183–184 (7th Cir. 1988), affg. 88 T.C. 663 (1987). We also referred to "the loose character of the critical word 'adjusted' in section 58(h)" and "the loose phrase 'shall be * * * adjusted'". *First Chicago Corp. v. Commissioner*, 88 T.C. at 672, 673.

Nevertheless, and notwithstanding these previously articulated shortcomings, section 58(h) does refer explicitly to "items of tax preference" as subject to adjustment. Focusing on this language, petitioners maintain that the regulation, unlike their approach, impermissibly adjusts credits rather than preferences. In our view, however, petitioners fail to give due regard to an important adjustment to "items of tax preference" that anchors both methods. Specifically, in the year preferences arise yet fail to provide a tax benefit, they are effectively reduced or ignored (for minimum tax purposes) so as to preclude the imposition of minimum tax on those preferences in that year. What happens after this initial preference reduction is where the parties' approaches

diverge, but, by this point, the operative phrase of the statute arguably has been satisfied.[7]

The courts have recognized the importance of a preference reduction in section 58(h). See *id.* at 669 (section 58(h) "reflected a congressional concern to avoid imposition of the minimum tax on preferences in situations where the preferences did not produce tax benefits"), affd. 842 F.2d at 181 ("Standing alone—that is, without section 58(h)—section 56(a) would impose minimum tax on tax-preference items even though the items never conferred a tax benefit on the taxpayer."); *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. at 824 ("Plainly, in enacting section 58(h), Congress was concerned about not imposing the minimum tax on tax preferences where such tax preferences did not result in a tax benefit."); see also *Occidental Petroleum Corp. v. United States*, 231 Ct. Cl. 334, 685 F.2d 1346 (1982) (taxpayer liable for minimum tax for years in which nonbeneficial preferences arose, which preceded enactment of section 58(h)).

For more direct indications of the origin and purpose of a statute, we look to the legislative history. We discover here that the congressional committee reports relating to section 58(h) do not address the appropriate tax consequences in the years of tax benefit. As stated in the Senate Finance Committee report:

*Tax benefit rule.*—There are certain cases under present law in which a person derives no tax benefit from a tax preference. For example, if an individual has no adjusted gross income because of deductions for accelerated depreciation on real property (an item of tax preference under the minimum tax) and also has itemized deductions (which under these circumstances he is unable to use), the tax benefit from the accelerated depreciation deductions may be reduced or eliminated because of the unused itemized deductions. However, the individual may still be subject to the minimum tax on the accelerated depreciation. Similar problems can occur in the case of deductions for percentage depletion, the capital gains deduction, rapid amortization and intangible drilling expenses. To some extent, the Internal Revenue Service has been able to deal with this issue through regulations. To deal with this problem specifically, the amendment instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax

[7] According to petitioners, sec. 58(h) "is best read to mean that petitioners' preferences should be adjusted (by being reduced) in 1982 when they do not produce a tax benefit and adjusted (by being increased) in the carryback years when they do produce a tax benefit." Although this is a possible reading, it is certainly not apparent from the express words of the statute.

benefit from the preference. For this purpose, a tax benefit includes tax deferral even if only for one year. The committee, by adding this provision, does not intend to make any judgment about the authority of the Treasury to issue these regulations under existing law. [S. Rept. 94–938, at 113–114 (1976), 1976–3 C.B. (Vol. 3) 49, 151–152.[8]]

The subsequent conference report also sheds no light on the matter. In a background discussion, the report describes the House bill as directing the Secretary "to issue regulations under which neither individuals nor corporations would be subject to the minimum tax on a tax preference if they received no tax benefit from the preference." S. Conf. Rept. 94–1236, at 425 (1976), 1976–3 C.B. (Vol. 3) 807, 829. The conference agreement, according to the report, simply "includes the tax benefit rule from the House bill." *Id.* at 426, 1976–3 C.B. (Vol. 3) at 830.

Nor do we see any inconsistency between the regulation and legislative history from 1989. The section 58(h) temporary regulations were published in May of 1989. Sec. 1.58–9T, Temporary Income Tax Regs., 54 Fed. Reg. 19366 (May 5, 1989). Later, a House-passed bill provided in part that "The provisions of section 58(h) * * * (as in effect on the day before the date of the enactment of the Tax Reform Act of 1986) shall be construed to authorize regulations providing adjustments to items other than tax preferences." H.R. 3299, sec. 11811(c)(1)(B), 101st Cong., 1st Sess. (1989). Although this broadening amendment did not appear in the ultimately enacted Omnibus Budget Reconciliation Act of 1989, Pub. L. 101–239, sec. 7811(d), 103 Stat. 2408, the conference report states:

The conferees do not intend any change in the scope of the authority provided in section 58(h) of prior law. Thus, only those regulations which would have been valid under section 58(h) of prior law are valid under the conference agreement. *No inference is intended as to whether the regulations issued by the Treasury Department are valid under section 58(h) or prior law.* [H. Conf. Rept. 101–386, at 664–665 (1989); emphasis added.]

Contending that the regulation is too far removed from the statutory language and congressional intent, petitioners cite *National Muffler Dealers Association v. United States*, 440 U.S. 472 (1979), in which the Supreme Court considered an

---

[8] On this subject, the report of the House Ways and Means Committee is identical in all material respects. H. Rept. 94–658, at 131–132 (1975), 1976–3 C.B. (Vol. 2) 695, 823–824.

interpretative regulation and described several factors that may relate to validity:

In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. [*Id.* at 477; citations omitted.]

According to petitioners, section 1.58–9, Income Tax Regs., fails all of these tests, most notably the manner of its evolution. In this specific regard, petitioners argue that the regulation is not entitled to the deference normally accorded legislative regulations because it was promulgated in bad faith. Petitioners point to, among other things, the Government's failing to issue the regulation until 13 years after the enactment of section 58(h) and, in the meantime, contesting in court taxpayers' efforts to benefit from the statute.

We observe generally that several of the factors mentioned in *National Muffler Dealers Association v. United States, supra*—contemporaneous construction, length of time in effect, reliance, and degree of congressional scrutiny—are not especially helpful in this setting, where we are dealing with a recently promulgated legislative regulation, unlike the interpretative regulation involved in *National Muffler.*

Concerning the purported bad faith, the record falls well short of confirming the allegation. In any event, we fail to see how the delay in issuing regulations benefited the Government in what petitioners presume was a "protecting the revenue" mindset. In *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. at 829, we expressly declined the opportunity to permit the Treasury, through its regulatory inaction, to render section 58(h) inoperative. Further, at the time we decided that case, we noted that Congress probably bore some responsibility for the delay. *Id.* at 829 n.6. In a subsequent case, the Commissioner agreed with the taxpayer to treat section 58(h) as a stand-alone substantive provision. *First Chicago Corp. v. Commissioner*, 88 T.C. at 669. In

short, the lack of regulations did not foreclose taxpayer relief under section 58(h).

Nonetheless, there is no question that the Commissioner, from a litigating standpoint, has taken a restrictive view of the taxpayer-favorable thrust of section 58(h). As petitioners disparagingly view it, section 1.58–9, Income Tax Regs., represents "an effort to salvage what is left of * * * [the Commissioner's] failed prior strategy."

We do not believe, however, that the Commissioner's litigating stance has any direct bearing on the validity of the regulation or on our standard of review. As discussed below, neither the result nor the rationale in *First Chicago Corp. v. Commissioner*, 88 T.C. 663 (1987), is inconsistent with the regulation. Indeed, petitioners' own characterization—"salvage what is left"—implicitly acknowledges that the regulation ventures into areas not yet judicially resolved. Although the Secretary has in effect allowed the courts to substitute their judgment for his delegated authority, he has not attempted through the regulation to override the courts. Consequently, we need not consider the extent to which, if at all, a legislative regulation may supplant prior case law interpretations of the delegating statute. In these circumstances, we also cannot agree with petitioners that the regulation was inappropriately promulgated to enhance respondent's litigating position.

Petitioners rely heavily upon this Court's opinion in *First Chicago* as justification for their recommended adjustment method. As petitioners read the opinion, we there "held that those preference items [that freed up credits] should be 'properly adjusted' under section 58(h) by being carried to the years in which the freed-up credits were used to reduce the taxpayer's regular tax." Further, argue petitioners, this Court "should continue to apply the relief it fashioned in *First Chicago*."

In *First Chicago*, however, we did not have before us a taxpayer that had yet gained a tax benefit from the use of freed-up credits. Moreover, the taxable years in issue were only those in which the subject preferences arose. Therefore, we were not called upon to decide exactly what would happen if and when the taxpayer realized a tax benefit. The issue in the instant cases differs from that in *First Chicago*, just as the issue in *First Chicago* was "quite different" from that in

*Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819 (1984). See *First Chicago Corp. v. Commissioner*, 88 T.C. at 673.

Admittedly, in *First Chicago* we assumed that if and when the taxpayer realized a tax benefit, there would be a contemporaneous and at least partially offsetting tax detriment. We did not, however, specifically endorse either alternative offered by the parties here, and we do not view our analysis in *First Chicago* as dependent upon petitioners' approach. Both petitioners' method and the regulation exact a tax cost in the year of the tax benefit, and we see this general principle as sufficient to support the result we reached in *First Chicago*. Furthermore, although the Court of Appeals may have assumed something similar to petitioners' approach in addressing the Commissioner's appellate arguments, the court's affirmance of our decision was not dependent upon such an assumption. See *First Chicago Corp. v. Commissioner*, 842 F.2d at 182–184.

As a somewhat more focused argument, petitioners point to an excerpt from a committee print, which relates to the origin of section 58(h) and was quoted and discussed in *First Chicago Corp. v. Commissioner*, 88 T.C. at 675:

> There are certain cases in which a person derives no tax benefit from an item of tax preference because, for example, the item is disallowed as a deduction under other provisions of the Code or because the taxpayer has sufficient deductions relating to nonpreference items to eliminate his taxable income.[1] To some extent, the Internal Revenue Service has been able to deal with this issue through regulations. To deal with this problem specifically, the [Tax Reform] Act [of 1976] instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax benefit from the preference. * * *

---

[1] For example, preference items giving rise to losses which are suspended under at risk provisions (sec. 465 or sec. 704(d) of the Code) are not to be considered to give rise to a tax benefit until the year in which the suspended deduction is allowed. Similarly, investment interest which is disallowed (under sec. 163(d)) is to be treated as an itemized deduction for purposes of that preference only in the year in which it is allowed (under sec. 163(d)).

Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 106–107 (J. Comm. Print 1976), 1976–3 C.B. (Vol. 2) 1, 118–119 (hereinafter referred

to as the General Explanation). Petitioners contend that the examples in the footnote illustrate the suspension and reactivation of preference items, which is the essence of their recommended approach.

We note first that the footnote is not worded precisely enough to be illustrative, necessarily, of petitioners' method. In any event, the Internal Revenue Code expressly authorizes a type of suspension and reactivation for sections 465, 704(d), and 163(d), and petitioners have not argued that the same or similar deferral provisions are implicated here. See sec. 465(a) ("Any loss * * * not allowed under this section for the taxable year shall be treated as a deduction * * * in the first succeeding taxable year."); sec. 704(d) ("Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership."); sec. 163(d)(2) ("The amount of disallowed investment interest for any taxable year shall be treated as investment interest paid or accrued in the succeeding taxable year."). In contrast to these provisions, petitioners would carry back suspended preferences only for minimum tax purposes, leaving regular taxable income in the carryback year unaffected.

We did state in *First Chicago*, as petitioners remind us: "There is *no meaningful difference* in respect of the minimum tax on preferences between suspension of the effect of the preference items here [i.e., accelerated depreciation, percentage depletion, capital gains] from suspension of the items referred to as '[examples]' " in the General Explanation. *First Chicago Corp. v. Commissioner*, 88 T.C. at 676 (emphasis added). However, the surrounding context of that statement reveals that we were simply considering whether section 58(h) authorized the deferral of minimum tax consequences until the preferences produced a tax benefit, and we ultimately concluded that such a deferral was authorized for both types of preferences. *Id.* at 675–676. We were not concerned with, nor did we address, the precise tax-computation mechanism in the year of the tax benefit.

Another of petitioners' objections to section 1.58–9, Income Tax Regs., is its apparent disregard of the "regular tax deduction" that ordinarily diminishes minimum tax liability. See sec. 56(a), (c). Through its credit-reduction mechanism, the regulation transforms a suspended minimum tax in the

year the nonbeneficial preferences arise into regular tax liability in the benefit year. This conversion from minimum tax to regular tax prevents the regular tax deduction from coming into play in the benefit year. Under petitioners' suspended-preference method, in contrast, which stays within the minimum tax realm, the aggregated preferences in the benefit year are offset by the regular tax deduction for that year. This, in petitioners' view, is an appropriate "matching" under section 56. Because the regular tax deductions for three of the four taxpayers here exceeded the preferences (including those carried back from 1982) in their respective carryback benefit years, petitioners' method results in no associated minimum tax liability (and no deficiency) for those three.

Petitioners assert that the regular tax deduction is important because it ensures that the minimum tax is imposed only when tax liability otherwise is "shockingly low", a phrase taken from *First Chicago Corp. v. Commissioner*, 842 F.2d at 181. Petitioners think it improper that respondent determined large deficiencies for years in which regular tax liability was not "shockingly low".

We are simply not persuaded, however, that the importance of the regular tax deduction in the minimum tax framework must extend to the year in which the taxpayer realizes the tax benefits of freed-up credits. Stated another way, although we do not question the importance of the regular tax deduction for the general purposes of section 56, we do not agree with petitioners, who fail to cite specific legislative history, that the regular tax deduction is a congressionally intended "fundamental part" of section 58(h). We also note that the regulation provides for an amount reflecting a regular tax deduction in the computation of the suspended minimum tax, which amount for petitioners totaled $6,194,754. See *supra* note 5 and accompanying text.

Under petitioners' reasoning, a taxpayer who benefits from freed-up credits would get the one established tax break of section 58(h) (no minimum tax in the year the preferences arise), *and* a chance at a second tax break (no minimum tax in the benefit year if the regular tax deduction in that year is large enough). Given the right circumstances, as illustrated by three of the four taxpayers here, a taxpayer could totally escape the suspended minimum tax consequences

from the year the preferences arise, despite benefiting from the use of the freed-up credits. We do not think the regulation unreasonable for methodologically precluding this result.[9]

As an affirmative argument in support of the regulation, respondent asserts that it is modeled after section 56(b), which until 1987 provided for deferral of minimum tax liability in situations involving net operating losses affected by preferences:

(1) IN GENERAL.—If for any taxable year a corporation—
  (A) has a net operating loss any portion of which (under section 172) remains as a net operating loss carryover to a succeeding taxable year, and
  (B) has items of tax preference in excess of $10,000,
then an amount equal to the lesser of the tax imposed by subsection (a) or 15 percent of the amount of the net operating loss carryover described in subparagraph (A) shall be treated as tax liability not imposed for the taxable year, but as imposed for the succeeding taxable year or years pursuant to paragraph (2).
(2) YEAR OF LIABILITY.—In any taxable year in which any portion of the net operating loss carryover attributable to the excess described in paragraph (1)(B) reduces taxable income, the amount of tax liability described in paragraph (1) shall be treated as tax liability imposed in such taxable year in an amount equal to 15 percent of such reduction.
(3) PRIORITY OF APPLICATION—For purposes of paragraph (2), if any portion of the net operating loss carryover described in paragraph (1)(A) is not attributable to the excess described in paragraph (1)(B), such portion shall be considered as being applied in reducing taxable income before such other portion.

Under section 56(b), if preferences served to increase a net operating loss (NOL) in a particular year, the minimum tax otherwise due on the preferences under section 56(a) was suspended until the later year or years, if any, in which the preferences provided a tax benefit through use of the NOL carryover. The amount of minimum tax imposed on the preferences was calculated with reference to the minimum tax rate and the regular tax deduction for the year in which the preferences originated. See S. Rept. 94–938, at 114 (1976), 1976–3 C.B. (Vol. 3) 49, 152. Enacted in 1969 as part of the then-new minimum tax, section 56(b) had been in existence for several years when Congress enacted section 58(h). See

---

[9] We recognize that petitioners' method could, in some situations, result in imposition of a higher minimum tax in the benefit year than was initially avoided.

Tax Reform Act of 1969, Pub. L. 91–172, sec. 301(a), 83 Stat. 580–581.

Petitioners do not dispute that section 56(b), in its basic methodology, is similar to the regulation they are here challenging. If the principles of section 56(b) were applied to petitioners' freed-up credits, the resulting tax liability in the carryback years would be calculated, unlike petitioners' approach, without regard to any regular tax deductions in those years. Petitioners argue, however, that if Congress had intended the same treatment for freed-up credits as for an increased NOL, section 58(h) or its legislative history would so indicate. Alternatively, say petitioners, Congress could have easily expanded section 56(b) to encompass freed-up credits. To emphasize the separateness of the provisions, and the one-of-a-kind nature of section 56(b), petitioners also point out that when Congress made major changes to the minimum tax structure in 1982 and 1986, it supplied transition rules for section 56(b) but not for section 58(h).[10]

While superficially appealing, petitioners' argument has a major weakness in its foundation, namely, the assumption that Congress, when enacting section 58(h), had a definite intention regarding the adjustment mechanism for freed-up credits. Petitioners ignore the possibility that Congress was willing to defer to the Treasury on the matter. Apart from the preference-adjustment language in section 58(h), which we have already discounted, there is nothing in the statute or its legislative history that reveals a congressional intent either to require or to preclude the suspended-tax principles of section 56(b) in the context of freed-up credits. In these circumstances, the very existence of section 56(b), as the only congressionally enacted application of the tax benefit rule to the minimum tax, is generally supportive of respondent's position.

Nonetheless, although Congress left the door open for application of the suspended-tax approach of section 56(b) to the freed-up credit situation, section 1.58–9, Income Tax Regs., does not follow section 56(b) precisely. As one example,

---

[10] Congress eliminated the add-on minimum tax for individuals in 1982. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, sec. 201, 96 Stat. 411–421. Congress repealed the remainder of the minimum tax in 1986, effective for taxable years beginning after 1986, replacing it with a comprehensive alternative minimum tax. Tax Reform Act of 1986, Pub. L. 99–514, sec. 701, 100 Stat. 2320–2345. See generally *First Chicago Corp. v. Commissioner*, 88 T.C. 663, 668 n.5 (1987), affd. 842 F.2d 180 (7th Cir. 1988).

the credit-reduction mechanism in the regulation applies to both carrybacks and carryovers, while section 56(b) applied only to carryovers. Moreover, the credit-reduction mechanism has the effect of suspending and reimposing tax but does it in an indirect way that differs from section 56(b).

In this regard, a major problem with the regulation, according to petitioners, is that it rewrites the intricate statutory regime involving credits and regular tax. Specifically, based on the incentive nature of many credits, petitioners contend that the regulation retroactively disrupts tax planning. Petitioners also emphasize that Congress has frequently amended the statutory credit provisions, sometimes with an eye toward mathematical precision, supposedly reflecting a "refined and specific" congressional intent in the credit area. As one purported example of disrupted planning and undermined congressional intent, petitioners refer to the possible effect of the regulation on the statutory special treatment for TRASOP credits. See *supra* note 5.

It is indeed true that the statutory credit provisions are complex, that they have been often amended, and that the regulation can affect them. We do not see these considerations, however, as fatal flaws in the regulation. First, the regulation only interacts with the statutory credit provisions when section 58(h) applies and, even then, only when the taxpayer benefits from freed-up credits in another year. Second, the regulation does not directly infringe upon most of the fundamental statutory credit provisions, including ordering and priority principles. Third, petitioners' examples of the regulation's effects on post-1982 statutory amendments are at best only indirectly relevant, given that respondent applies the regulation to petitioners for earlier years. Fourth, petitioners illustrate their concerns about the TRASOP credit by means of a hypothetical taxpayer subject to minimum tax in the benefit year, a circumstance not shared by any of the four taxpayers in the instant cases.[11]

Petitioners also challenge the motivation behind the credit-reduction mechanism of the regulation. They allege that the regulation is an attempt to correct what the Treasury supposedly perceived as a congressional oversight: the failure to

---

[11] Conoco and its affiliated corporations have a minimum tax liability for 1980, in petitioners' view, but only because of the large preference balance carried back from 1982 under petitioners' suspended-preference method.

provide a section 58(h) transition rule in 1986 to bridge the outgoing corporate minimum tax and the incoming alternative minimum tax.[12] The credit-reduction mechanism, allege petitioners, was intended to ensure that the suspended tax would survive intact into post-1986 years, when the minimum tax would not otherwise apply. See *supra* note 10.

We observe, first, that the question of whether the regulation goes too far for post-1986 years is one we need not definitively resolve in the context of these pre-1986 taxable years. Even assuming that petitioners have hit upon a primary motivation behind the credit-reduction mechanism, however, we are aware of no specific congressional intent that might preclude the Treasury from using its delegated authority in a manner analogous to that used by Congress itself in the transition rule for section 56(b). See *supra* note 12. In addition, petitioners have not enlightened us as to how they are disadvantaged by credit reduction as compared to a purer, and apparently less objectionable, suspended-tax approach like that of section 56(b).

We hold that section 1.58–9, Income Tax Regs., is a valid regulation as invoked by respondent in determining the subject deficiencies. The regulation postpones minimum tax liability in the year nonbeneficial preferences arise, which is consistent with *First Chicago Corp. v. Commissioner*, 88 T.C. 663 (1987). Further, the deferral becomes outright forgiveness if the freed-up credits fail to provide a tax benefit before they expire, which is consistent with *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819 (1984). Only if and when the freed-up credits provide a tax benefit does the taxpayer become subject to the deferred tax liability. This regulatory formulation, as applied in the present circumstances, is reasonably limited in its scope and effect, and we, unlike

---

[12] Congress provided such a transition rule for suspended minimum tax under sec. 56(b) by requiring pre-1987 NOL carryovers, which were usable against the new alternative minimum tax, to first be reduced by the amount of preferences that had caused the suspended minimum tax:

(B) CORPORATIONS.—If the minimum tax of a corporation was deferred under section 56(b) of the Internal Revenue Code of 1954 * * * for any taxable year beginning before January 1, 1987, and the amount of such tax has not been paid for any taxable year beginning before January 1, 1987, the amount of the net operating loss carryovers of such corporation which may be carried to taxable years beginning after December 31, 1986, for purposes of the [alternative] minimum tax shall be reduced by the amount of tax preferences a tax on which was so deferred. [Tax Reform Act of 1986, Pub. L. 99–514, sec. 701(f)(2)(B), 100 Stat. 2344.]

petitioners, do not view the regulation as an abusive exercise of "unbridled discretion" by the Treasury.

Finally, in upholding the validity of the regulation, we do not mean to suggest that petitioners' alternative approach is necessarily an unreasonable means of implementing section 58(h). That issue is one we do not reach. See *National Muffler Dealers Association v. United States*, 440 U.S. at 488 ("The choice among reasonable interpretations is for the Commissioner, not the courts."); *Fulman v. United States*, 434 U.S. 528, 536 (1978); *Estate of Bullard v. Commissioner*, 87 T.C. at 281.

To reflect the foregoing,

*Decisions will be entered for respondent.*